## ORNELAS v. RUIZ.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF TEXAS.

No. 622. Argued January 13, 1896. — Decided March 16, 1896.

The appellees were brought before a Circuit Court commissioner in the Western District of Texas, charged by the Mexican consul with the commission, in Mexico, of a crime extraditable under the treaty of June 20, 1862. The commissioner found the evidence sufficient to warrant their commitment for extradition. On the application of the prisoners a writ of *habeas corpus* was issued by the United States District Judge, directed to the marshal of the district. The judge, after hearing, decided that the offences charged were political offences, and not extraditable, and ordered the prisoners discharged. From this judgment the consul appealed to this court. *Held*, that as his government was the real party

interested, the appeal was properly prosecuted by him; and as the construction of the treaty was drawn in question, it was properly taken to this court.

The order of the District Court requiring the petitioners to enter into recognizances for their appearance to answer its judgment was rightly made.

A writ of *habeas corpus* cannot perform the office of a writ of error, and in extradition proceedings, if the committing magistrate has jurisdiction of the subject-matter and of the accused, and the offence charged is within the terms of the treaty of extradition, and the magistrate, in arriving at a decision to hold the accused, has before him competent legal evidence on which to exercise his judgment as to whether the facts are sufficient to establish the criminality of the accused for the purposes of extradition, such decision cannot be reviewed on *habeas corpus.*

Whether an extraditable crime has been committed is a question of mixed law and fact, but chiefly of fact, and the judgment of the magistrate rendered in good faith on legal evidence that the accused is guilty of the act charged, and that it constitutes an extraditable crime, cannot be reviewed on the weight of evidence, and is final for the purposes of the preliminary examination unless palpably erroneous in law.

It is enough if it appear that there was legal evidence on which the commissioner might properly conclude that the accused had committed offences within the treaty as charged, and so be justified in exercising his power to commit them to await the action of the Executive Department.

ON complaints made by Plutarco Ornelas, consul of the Republic of Mexico, charging Juan Duque, Inez Ruiz, and Jesus Guerra with the commission of murder, arson, robbery, and kidnapping, at the village of San Ygnacio, in the State of Tamaulipas, Republic of Mexico, on December 10, 1892; that they were fugitives from justice of the State of Tamaulipas and the Republic of Mexico, and had fled into the jurisdiction of the United States for the purpose of seeking an asylum; and that the alleged crimes were enumerated and embraced in the treaty of extradition then in force between the United States and the Republic of Mexico, warrants were issued by L. F. Price, commissioner of the Circuit Court of the United States for the Western District of Texas, duly authorized, for their apprehension, on which they were arrested and brought before the commissioner to answer the premises and to be dealt with according to law and the provisions of the treaty. The cases were heard, and the commis-

sioner found that the evidence was sufficient in law to justify their commitment on such charges, and that they should be placed in custody to await the order of the President of the United States in the premises.

Thereupon Ruiz, Guerra and Duque applied to the District Court of the United States for the Western District of Texas for writs of *habeas corpus*, alleging that they were unlawfully restrained of their liberty by the United States marshal for that district, and praying that they be released.

The writs were issued, and the marshal made his return, showing that he held petitioners by virtue of warrants issued by the United States commissioner on the application of the Mexican government for their extradition on the aforesaid charges. With the writs of *habeas corpus* were issued writs of *certiorari* directing the commissioner to send up the original papers and a transcript of the testimony on which the prisoners were committed. This was done, and on consideration of the cases the District Court held on the evidence that the offences with which petitioners were charged were purely political offences, for the commission of which petitioners were not extraditable, and entered a final order discharging petitioners from the custody of the marshal on giving bond for their appearance to answer the judgment on appeal. From this final order, the consul of the Republic of Mexico prayed an appeal to this court.

The following are articles of the extradition treaty between the United States and the Republic of Mexico proclaimed June 20, 1862, 12 Stat. 1199 :

"Article I. It is agreed that the contracting parties shall, on requisitions made in their name, through the medium of their respective diplomatic agents, deliver up to justice persons who, being accused of the crimes enumerated in article third of the present treaty, committed within the jurisdiction of the requiring party, shall seek an asylum, or shall be found within the territories of the other : *Provided*, That this shall be done only when the fact of the commission of the crime shall be so established as that the laws of the country in which the fugitive or the person so accused shall be found,

would justify his or her apprehension and commitment for trial if the crime had been there committed.

"Article II. In the case of crimes committed in the frontier States or Territories of the two contracting parties, requisitions may be made through their respective diplomatic agents, or through the chief civil authority of said States or Territories, or through such chief civil or judicial authority of the districts or counties bordering on the frontier as may for this purpose be duly authorized by the said chief civil authority of the said frontier States or Territories, or when, from any cause, the civil authority of such State or Territory shall be suspended, through the chief military officer in command of such State or Territory.

"Article III. Persons shall be so delivered up who shall be charged, according to the provisions of this treaty, with any of the following crimes, whether as principals, accessories, or accomplices, to wit: Murder, (including assassination, parricide, infanticide, and poisoning,) assault with intent to commit murder, mutilation, piracy, arson, rape, kidnapping, defining the same to be the taking and carrying away of a free person by force or deception; forgery, including the forging or making, or knowingly passing or putting in circulation counterfeit coin or bank notes, or other paper current as money, with intent to defraud any person or persons; the introduction or making of instruments for the fabrication of counterfeit coin or bank notes, or other paper current as money; embezzlement of public moneys, robbery, defining the same to be the felonious and forcible taking from the person of another of goods or money to any value, by violence or putting him in fear; burglary, defining the same to be breaking and entering into the house of another with intent to commit felony; and the crime of larceny, of cattle, or other goods and chattels, of the value of twenty-five dollars or more, when the same is committed within the frontier States or Territories of the contracting parties.

"Article IV. On the part of each country the surrender of fugitives from justice shall be made only by the authority of the executive thereof, except in the case of crimes committed

within the limits of the frontier States or Territories, in which latter case the surrender may be made by the chief civil authority thereof, or such chief civil or judicial authority of the districts or counties bordering on the frontier as may for this purpose be duly authorized by the said chief civil authority of the said frontier States or Territories, or, if, from any cause, the civil authority of such State or Territory shall be suspended, then such surrender may be made by the chief military officer in command of such State or Territory.

" Article V. All expenses whatever of detention and delivery effected in virtue of the preceding provisions shall be borne and defrayed by the government or authority of the frontier State or Territory in whose name the requisition shall have been made.

" Article VI. The provisions of the present treaty shall not be applied in any manner to any crime or offence of a purely political character, nor shall it embrace the return of fugitive slaves, nor the delivery of criminals who, when the offence was committed, shall have been held in the place where the offence was committed in the condition of slaves, the same being expressly forbidden by the constitution of Mexico ; nor shall the provisions of the present treaty be applied in any manner to the crimes enumerated in the third article committed anterior to the date of the exchange of the ratifications hereof.

" Neither of the contracting parties shall be bound to deliver up its own citizens under the stipulations of this treaty."

*Mr. J. H. McLeary* for appellant. *Mr. John W. Foster, Mr. S. F. Phillips,* and *Mr. F. D. McKenney* were on his brief.

*Mr. T. J. McMinn* for appellee. *Mr. W. H. Brooker* was on his brief.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

The Republic of Mexico applied for the extradition of these petitioners by complaints made under oath by its consul at

San Antonio, Bexar County, Texas, under section 5270 of the Revised Statutes. The official character of this officer must be taken as sufficient evidence of his authority, and as the government he represented was the real party interested in resisting the discharge, the appeal was properly prosecuted by him on its behalf. *Wildenhus's case,* 120 U. S. 1. As the construction of the treaty was drawn in question the appeal was taken directly to this court, and the District Court rightly required petitioners, under Rule 34, to enter into recognizance for their appearance to answer its judgment.

The legislative provisions on the subject of extradition are to be found in sections 5270 to 5280, constituting Title LXVI of the Revised Statutes. Section 5270 provides: "Whenever there is a treaty or convention for extradition between the government of the United States and any foreign government, any Justice of the Supreme Court, Circuit Judge, District Judge, commissioner authorized so to do by any of the courts of the United States, or judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within the limits of any State, district, or Territory, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or commissioner, to the end that the evidence of criminality may be heard and considered. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made."

In the extradition case of *In re Stupp,* 12 Blatchford, 501, Mr. Justice Blatchford, then District Judge, carefully consid-

ered the provisions of the Revised Statutes in respect of the issue of writs of *habeas corpus* and *certiorari* by the courts and judges of the United States, Rev. Stat. §§ 751 to 761, and the acts of Congress from which those sections were brought forward, and pointed out that the general language used is as applicable to a case where the party is in custody under process issued on a final judgment of a court of the United States on a conviction on an indictment as it is to a case where a party is in custody under any other process; that it could not be successfully contended that these provisions have the effect to authorize a court of the United States, which has no direct power given to it to review the final judgment of another court of the United States in a given case, to review such judgment on the merits under the indirect authority of a writ of *habeas corpus;* and that, therefore, as the statute in respect of extradition gives no right of review to be exercised by any court or judicial officer, but the magistrate is to certify his findings on the testimony to the Secretary of State, that the case may be reviewed by the Executive Department of the government, the court issuing the writ may " inquire and adjudge whether the commissioner acquired jurisdiction of the matter, by conforming to the requirements of the treaty and the statute; whether he exceeded his jurisdiction; and whether he had any legal or competent evidence of facts before him, on which to exercise a judgment as to the criminality of the accused. But such court is not to inquire whether the legal evidence of facts before the commissioner was sufficient or insufficient to warrant his conclusion."

By repeated decisions of this court it is settled that a writ of *habeas corpus* cannot perform the office of a writ of error, and that, in extradition proceedings, if the committing magistrate has jurisdiction of the subject-matter and of the accused, and the offence charged is within the terms of the treaty of extradition, and the magistrate, in arriving at a decision to hold the accused, has before him competent legal evidence on which to exercise his judgment as to whether the facts are sufficient to establish the criminality of the accused for the

purposes of extradition, such decision cannot be reviewed on *habeas corpus*. *In re Oteiza y Cortez, Petitioner*, 136 U. S. 330; *Benson* v. *McMahon*, 127 U. S. 457; *Fong Yue Ting* v. *United States*, 149 U. S. 698, 714.

As the English extradition act of 1870, 33 & 34 Vict. c. 52, extracts from sections 3 and 11 of which are given below,[1] contemplates an independent examination on *habeas corpus* in every case, if applied for, as in effect part of the proceedings, it has been held that the courts have power to go into the whole matter under the writ so provided for. *In re Castioni*, L. R. 1 Q. B. 1891, 149; *In re Arton*, 1896, 1 Q. B. 108. But the legislation of Congress in respect of extradition is widely different, and the scope of inquiry on the writ of *habeas corpus* is necessarily much narrower.

Whether an extraditable crime has been committed is a question of mixed law and fact, but chiefly of fact, and the judgment of the magistrate rendered in good faith on legal evidence that the accused is guilty of the act charged, and that it constitutes an extraditable crime, cannot be reviewed on the weight of evidence, and is final for the purposes of the preliminary examination unless palpably erroneous in law.

---

[1] 3. "A fugitive criminal shall not be surrendered if the offence in respect of which his surrender is demanded is one of a political character, or if he prove to the satisfaction of the police magistrate, or the court before whom he is brought on *habeas corpus*, or to the Secretary of State, that the requisition for his surrender has in fact been made with a view to try or punish him for an offence of a political character."

11. "If the police magistrate commits a fugitive criminal to prison, he shall inform such criminal that he will not be surrendered until after the expiration of fifteen days, and that he has a right to apply for a writ of *habeas corpus*. Upon the expiration of the said fifteen days, or, if a writ of *habeas corpus* is issued, after the decision of the court upon the return to the writ, as the case may be, or after such further period as may be allowed in either case by a Secretary of State, it shall be lawful for a Secretary of State by a warrant under his hand and seal, to order the fugitive criminal (if not delivered on the decision of the court) to be surrendered to such person as may in his opinion be duly authorized to receive the fugitive criminal by the foreign State from which the requisition for the surrender proceeded, and such fugitive criminal shall be surrendered accordingly."

It must be assumed on this record that the commissioner was duly authorized; that petitioners were not citizens of the United States but were citizens of Mexico; that the acts charged were committed in Mexico, and were considered crimes under both governments; that no objection requiring consideration exists in the mode of procedure; and that the commissioner had jurisdiction of the person, and of the subject-matter, if, on the evidence, the offences charged were within the terms of the treaty.

The release of petitioners was ordered on the sole ground that, as appears from the portion of the opinion of the learned District Judge contained in the record, this raid was part of "a political movement, having for its purpose the overthrow of the existing government in Mexico, and that the offences committed by the petitioners and their associates in their vain and visionary attempt to accomplish their purpose were purely political offences within the meaning of the sixth article of the treaty of extradition." The evidence before the commissioner, from which this conclusion was deduced, tended to show that on December 10, 1892, a band of armed men to the number of one hundred and thirty or forty, under the leadership of one Francisco Benevides, passed over the Rio Grande from Texas into Mexico, and attacked about forty Mexican soldiers stationed at the village of San Ygnacio; killing and wounding some of them, and capturing others, who were afterwards released; burning their barracks and taking away their horses and equipments; that private citizens were also violently assaulted; horses belonging to them taken; houses burned; small sums of money extorted from women; clothes, provisions, and goods appropriated; and three citizens kidnapped and carried over the river to the Texas side, finally escaping; that these men were bandits, without uniforms or flag, but with a red band on their hats; and that Garza was not there and had nothing to do with the expedition. The band remained on the Mexican side of the river about six hours and recrossed at the village ford. Petitioners were members of the band, and citizens of Mexico, as appeared from the complaints and testimony, though one of them at

least had resided a large part of the time, for many years, in Texas. Evidence on behalf of petitioners was adduced indicating that there had been a revolutionary movement on that border under one Garza in 1891; that indictments had been found against the participants for violation of the neutrality laws; and that the aim, object and purpose of Benevides' men was the same as Garza's, "to cross over the river and fight against the government."

In the course of his opinion the District Judge referred to the views of the State Department as to the transaction at San Ygnacio. We presume this reference is to the note of Mr. Secretary Gresham to the Minister of Mexico, May 13, 1893, in respect of the extradition of Benevides. The facts were reviewed therein by the Secretary, and it was held that the acts for which his extradition was asked were "not of such a purely political character as to exclude them from the operation of the treaty." The Secretary concluded his resumé with these words: "The idea that these acts were perpetrated with *bona fide* political or revolutionary designs is negatived by the fact that immediately after this occurrence, though no superior armed force of the Mexican government was in the vicinity to hinder their advance into the country, the bandits withdrew with their booty across the river into Texas." But extradition was not granted because it appeared that Benevides was a citizen of the United States.

The District Judge entertained different views from those of the Secretary, and arrived at a different result from that reached by the commissioner on the evidence on which the latter proceeded, and so was induced to substitute his judgment for that of the commissioner, in whom was reposed the authority of decision, unless jurisdiction were lacking.

Can it be said that the commissioner had no choice on the evidence but to hold, in view of the character of the foray, the mode of attack, the persons killed or captured, and the kind of property taken or destroyed, that this was a movement in aid of a political revolt, an insurrection or a civil war, and that acts which contained all the characteristics of crimes under the ordinary law were exempt from extradition because

of the political intentions of those who committed them? In our opinion this inquiry must be answered in the negative.

The contention that the right of the executive authority to determine when offences charged are or are not purely political is exclusive is not involved in any degree; nor are we concerned with the question of the actual criminality of petitioners if the commissioner had probable cause for his action. It is enough if it appear that there was legal evidence on which the commissioner might properly conclude that the accused had committed offences within the treaty as charged, and so be justified in exercising his power to commit them to await the action of the Executive Department. The rule as to probable cause was thus laid down by Mr. Chief Justice Marshall, sitting as a committing magistrate, in *Burr's case:* " On an application of this kind I certainly should not require that proof which would be necessary to convict the persons to be committed, on a trial in chief; nor should I even require that which should absolutely convince my own mind of the guilt of the accused; but I ought to require, and I should require, that probable cause be shown; and I understand probable cause to be a case made out by proof furnishing good reason to believe that the crime alleged has been committed by the person charged with having committed it." 1 Burr's Trial, 11; *Benson* v. *McMahon,* 127 U. S. 457, 462; *In re Farez,* 7 Blatchford, 345; *In re Ezeta,* 62 Fed. Rep. 972, 981.

We are of opinion that it cannot be held that there was substantially no evidence calling for the judgment of the commissioner as to whether he would, or would not, certify and commit under the statute, and that, therefore, as matter of law, he had no jurisdiction over the subject-matter; and, this being so, his action was not open to review on *habeas corpus.*

*The final order of the District Court is therefore reversed and the case remanded for further proceedings in conformity to law.*