**Branko KARADZOLE, Consul General of *the Federal People's Republic of Yugoslavia,* and Robert W. Ware, United States Marshal, Appellants,**

**v.**

**Andrija ARTUKOVIC, Appellee.**

**No. 15217.**

United States Court of Appeals Ninth Circuit.

June 24, 1957.

Ronald Walker, Los Angeles, Cal., Pehle, Lesser, Mann, Riemer & Luxford, Lawrence S. Lesser, Washington, D. C., George E. Danielson, Los Angeles, Cal., for appellants.

Edward J. O'Connor, O'Connor & O'Connor, Vincent G. Arnerich, Los Angeles, Cal., Robert T. Reynolds, Washington, D. C., for appellee.

Before STEPHENS, HEALY and POPE, Circuit Judges.

STEPHENS, Circuit Judge.

This is a case of first impression involving extradition of an alleged World War II war criminal. Rafo Ivancevic, Consul General of the Federal People's Republic of Yugoslavia, in August, 1951, filed, with the United States Commissioner at Los Angeles, California, a formal request upon behalf of his country that an order issue for the extradition of appellee Andrija Artukovic, alias Alois Anich, to Yugoslavia, in which country a warrant is outstanding for his arrest as a fugitive charged with the crime of murder.[1] An amended complaint was filed October 15, 1951. The Commissioner ordered Artukovic held by the United States Marshal, and Artukovic thereupon petitioned the District Court for the issuance of the writ of *habeas corpus* praying that the court order his release. Artukovic attacked the jurisdiction of the proceedings on two grounds: i. e., that the charge against him was of a political nature and therefore was not an extraditable offense,[2] and that no treaty of extradition existed between the United States and Yugoslavia. After a hearing, the District Court held that the extradition treaty of 1902 between the United States of America and the Kingdom of Servia (Serbia) was not in force and effect between the United States of America and Yugoslavia, and ordered the release of appellee Artukovic. Artukovic v. Boyle, D.C., 107 F.Supp. 11. The United States and Rafo Ivancevic, as Consul General of Yugoslavia, appealed. This Court reversed, holding that the extradition treaty between the United States and the Kingdom of Servia (Serbia) in 1902 is a valid and effective

1. Title 18 U.S.C.A. § 3184; Article II of the Treaty of Extradition between the United States of America and the Kingdom of Servia (Serbia), proclaimed May 17, 1902, 32 Stat. 1890.

2. Crimes of a political nature are specifically excluded as subjects for extradition under Article VI of the Treaty of Extradition between the United States of America and the Kingdom of Servia.

treaty between the United States and the Federal People's Republic of Yugoslavia and remanded the case to the District Court for the adjudication of other issues in the case. Ivancevic v. Artukovic, 9 Cir., 1954, 211 F.2d 565, certiorari denied 348 U.S. 818, 75 S.Ct. 28, 99 L.Ed. 645, rehearing denied 348 U.S. 889, 75 S.Ct. 202, 99 L.Ed. 698. Further hearings were held in the District court as to the remaining issue, and that Court decided that the alleged offenses charged in the amended Complaint were of a "political character" within the meaning of Article VI of the treaty[3] and that therefore appellee Artukovic could not be extradited. The District Judge pointed out that the matter was before him prior to any hearing by a committing magistrate, and the sole function of the court was to determine whether on the face of the pleadings an extraditable offense under the treaty was stated. The court noted that the text of the amended Complaint differed from the Indictment, but that the Complaint had attached to it a copy of the Indictment as it was filed in the office of the County Public Prosecutor, Zagreb, Yugoslavia. The District Court read the Complaint and the Indictment as a whole and made the following comments in its Order:

"The Indictment charges that the petitioner was 'Minister of the Interior' from April 16, 1941 to October 10, 1942, in the cabinet of a government called 'Pavelic' government. Many references are made to the fact that during the entire period involved in the Indictment, the petitioner occupied such position in such government. The court takes judicial notice of the fact that prior to, or at, or about, the time of the invasion of Yugoslavia by the German armies in early April, 1941, the head of the government of Yugoslavia, and all of the principle [sic] officials of that government, fled the country; and that on April 10, 1941, the portion of Yugoslavia known as 'Croatia' established an independent government with a full set of officers, and sought recognition by other governments (and secured recognition by some governments), in which the petitioner became an official and was Minister of the Interior of that government during all of the period of time covered by the Indictment.

"It appears from the face of the Indictment that all of the asserted offenses for which extradition is sought were the result of 'orders' issued by the petitioner, acting as such official of the above-mentioned government during the time of war.

"The Indictment is in vehement language, and it and the briefs of the parties reflect the animus which has existed between the Croatians and the Serbs for many hundreds of years, as well as the deep religious cleavage known to exist among the peoples in the Balkans.

"The Court has not counted the number of persons named, but notes that according to the parties, the Complaint names 1,293 persons as having been killed on 'orders' of the petitioner.

"But the Indictment does not stop at that. In Paragraph 7 on page 9, it is alleged that 30,000 unidentified persons were killed on 'orders' of the petitioner and further, in Paragraph 7 on page 14, approximately 3,000 more unidentified persons are alleged to have been killed on 'orders' of the petitioner. In Paragraph 8 on page 15, it is alleged that as a result of 'orders' of the petitioner, 200,000 persons were killed. On page 17, it is alleged that a total

3. Article VI of the treaty, in its pertinent portion, provides as follows:

"A fugitive criminal shall not be surrendered if the offense in respect of which his surrender is demanded be of a political character, or if he proves that the requisition for his surrender has, in fact, been made with a view to try or punish him for an offense of a political character."

of 17,600 unidentified children were killed on 'orders' of the petitioner.

"It would be a work of supererogation to analyze the Indictment further. Though the Indictment is not bad because it charges the death of more than one person, the plain reading of the Indictment here makes it immediately apparent that the offenses for which the surrender of the petitioner is sought, were offenses of a political character. (In re Ezeta, D.C., 62 F. 972, and cases there cited.) See also: Hackworth—Digest of International Law, Vol. IV, 1952 Ed., page 45 et seq., Section 316, and cases there collected, which show that officials of the United states, Mexico and many other countries on similar accusations, have uniformly held that conduct, such as that with which petitioner is charged in the Indictment here, was conduct of a political character and not extraditable under a treaty in terms such as the one before the court."

The District Judge held (for the reasons above set forth) that Artukovic was entitled to the writ of *habeas corpus* and ordered its issuance and his discharge from custody. Artukovic v. Boyle, D.C.1956, 140 F.Supp. 245. Appellant, Branko Karadzole, substituted as Consul General of the Federal People's Republic of Yugoslavia, appeals from that judgment.[4]

The Appeal.

This proceeding arises on *habeas corpus* prior to hearing before a committing magistrate, and is entirely proper if the District Court confines its determination to the question whether the committing magistrate has jurisdiction.[5] Terlinden v. Ames, 1902, 184 U.S. 270, 22 S.Ct. 484, 46 L.Ed. 534; In re Heilbonn, 1853, 1 Park.Cr.R., N.Y., 429. The committing magistrate has jurisdiction, at this stage of the case, if there is a treaty and the commission of extraditable offenses is charged. Terlinden v. Ames, supra; In re Luis Oteiza y Cortes, 1889, 136 U.S. 330, 10 S.Ct. 1031, 34 L.Ed. 464; In re Stupp, 1875, 23 Fed.Cas.No.13,563, 12 Blatchf. 501; Ornelas v. Ruiz, 161 U.S. 502, 508, 16 S.Ct. 689, 40 L.Ed. 787; Fernandez v. Phillips, 268 U.S. 311, 45 S.Ct. 541, 69 L.Ed. 970. In Terlinden v. Ames, supra, the writ of *habeas corpus* was issued before the examination by the commissioner was entered upon, and the inquiry was held to be confined to the question of jurisdiction of the commissioner or magistrate. It was therein determined that the committing magistrate had jurisdiction and the petition for the writ was dismissed. But it was pointed out in the case that [184 U.S. 270, 22 S.Ct. 488] "On the face of the complaint

4. In the earlier appeal to this Court, the United States filed an amicus curiae brief requesting reversal of the District Court judgment as to the non-existence of a valid treaty between the United States and Yugoslavia. It was stated in the government's brief that the "Executive Branch of the Government is not presently concerned with this phase of the case [whether Artukovic is extraditable under the treaty] and will not be concerned with it unless and until it shall have been certified to the Department of State by the extradition magistrate pursuant to the provisions of 18 U.S.C. § 3184." The government has filed no brief in the instant appeal and Robert W. Ware, U. S. Marshal, is only a nominal party.

5. We find in II Hyde, International Law (2nd Revised Edition, 1945), p. 1026, footnote 3, the following language which is here pertinent:

"* * * The situation [that there is no appeal from the decision of the committing magistrate] would be otherwise, however, in the fanciful case where, irrespective of the testimony offered, it should appear from the allegations of the complaint that extradition of the accused was sought in order to prosecute him for a political offense, and the decision of the committing magistrate was adverse to the contentions of the prisoner."

In the instant case we have no decision of the magistrate, but if the complaint and attached documents clearly show a political offense, such decision would not be necessary.

extraditable offences were charged to have been committed * * *."

We have previously held that a valid treaty exists between the United States and Yugoslavia. Ivancevic v. Artukovic, supra. The sole question therefore before the District Court was whether on the face of the Complaint and the attached Indictment, together with the facts of which the court could take judicial notice, it could clearly be said that the offenses charged were of a political character. Appellant argues that it was error for the District Court to so hold. We initially determine this point without considering any possible legal significance that might result because the offenses charged are called "war crimes" in the Indictment, and the fact that appellant admits that Artukovic is sought as a "war criminal." Perhaps the leading case on the subject is In re Castioni, (1891) 1 Q.B. 149. In that case, the following pertinent comments are made:

Denman, J. (page 156).

"I think that in order to bring the case within the words of the Act and to exclude extradition for such an act as murder, which is one of the extradition offences, it must be shewn that the act is done in furtherance of, done with the intention of assistance, as a sort of overt act in the course of acting in a political matter, a political rising, or a dispute between two parties in the State as to which is to have the government in its hands, before it can be brought within the meaning of the words used in the Act."

Denman, J. (page 159).

"The question really is whether, upon the facts, it is clear that the man was acting as one of a number of persons engaged in acts of violence of a political character with a political object, and as part of the political movement and rising in which he was taking part."

Hawkins, J. (page 165).

"Now what is the meaning of crime of a political character? I have thought over this matter very much indeed, and I have thought whether any definition can be given of the political character of the crime—I mean to say, in language which is satisfactory. I have found none at all, and I can imagine for myself none so satisfactory, and to my mind so complete, as that which I find in a work which I have now before me, and the language of which for the purpose of my present judgment I entirely adopt, and that is the expression of my brother Stephen in his History of the Criminal Law of England in vol. ii, pp. 70, 71. I will not do more than refer to the interpretations, other than those with which he agrees, which have been given upon this expression, 'political character'; but I adopt his definition absolutely. 'The third meaning which may be given to the words, and which I take to be the true meaning, is somewhat more complicated than either of those I have described. An act often falls under several different definitions. For instance, if a civil war were to take place, it would be high treason by levying war against the Queen. Every case in which a man was shot in action would be murder. Whenever a house was burnt for military purposes arson would be committed. To take cattle, &c., by requisition would be robbery. According to the common use of language, however, all such acts would be political offences, because they would be incidents in carrying on a civil war. I think, therefore that the expression in the Extradition Act ought (unless some better interpretation of it can be suggested) to be interpreted to mean that fugitive criminals are not to be surrendered for extradition crimes, if those crimes were incidental to and formed a part of political disturbances. I do not wish to enter into details beforehand on a subject which might

at any moment come under judicial consideration.' "

Hawkins, J. (page 167).

"I cannot help thinking that everybody knows there are many acts of a political character done without reason, done against all reason; but at the same time one cannot look too hardly and weigh in golden scales the acts of men hot in their political excitement. We know that in heat and in heated blood men often do things which are against and contrary to reason; but none the less an act of this description may be done for the purpose of furthering and in furtherance of a political rising, even though it is an act which may be deplored and lamented, as even cruel and against all reason, by those who can calmly reflect upon it after the battle is over. For the reasons I have expressed, I am of the opinion that this rule ought to be made absolute, and that the prisoner to be discharged."

The Castioni case was recently reconsidered by the English courts (Queen's Bench Division) in Ex parte Kolczynski, 1954, 2 Weekly Law Reports 116 (1955); 1 All.E.R. 31. The case involved seven Polish sailors who seized control of a trawler and steered to an English port where they sought asylum. Warrants were issued in Warsaw charging them with extraditable offenses. The English court held that the seamen had proved to the satisfaction of the court that the requests for extradition had in fact been made with a view to trying or punishing them for an offense of a political character.[6] It was stated in the case:

Cassels, J.

"The words 'offence of a political character' must always be considered according to the circumstances existing at the time when they have to be considered. The present time is very different from 1891, when Castioni's case was decided. * * * "

Lord Goddard, C. J., stated:

"The Court in Castioni's case were careful to say that they were not giving an exhaustive definition of the words 'of a "political character." ' * * * The evidence about the law prevalent in the Republic of Poland today shows that it is necessary, if only for reasons of humanity, to give a wider and more generous meaning to the words we are now construing, which we can do without in any way encouraging the idea that ordinary crimes which have no political significance will be thereby excused."

American cases[7] have more or less adopted language used in Castioni. In the instant case we are dealing with a so-called relative political offense in that a common crime is said to be connected with a political act.[8] Other than the

6. In the Kolczynski case, we note that the opinion of Hawkins, J., in In re Castioni, 1 Q.B. 149, 163, as to the duties of magistrates was not followed. The opinion apparently stands (although the point is not entirely clear) for the proposition that in England the committing magistrate is to determine whether the requisition for the surrender of the fugitive criminal has *in fact* been made with a view to try to punish him for an offense of a political character. See comment in 18 Modern Law Review 380, (1955, Stevens & Sons Limited, London). Compare discussion of similar problem in American cases of In re Lincoln, D.C., 228 F. 70, 74; In re Ezeta, D.C.E.D. Cal.1894, 62 F. 972 and Laubenheimer v. Factor, 7 Cir., 1932, 61 F.2d 626, 628.

7. In re Ezeta, D.C.N.D.Cal.1894, 62 F. 972; Ornelas v. Ruiz, 1896, 161 U.S. 502, 16 S.Ct. 689, 40 L.Ed. 787; Luis Oteiza y Cortes v. Jacobus, 136 U.S. 330, 10 S.Ct. 1031, 34 L.Ed. 464; United States ex rel. Giletti v. Commissioner of Immigration, 2 Cir., 35 F.2d 687.

8. See Vol. I Oppenheim's International Law, Lauterpacht (7th Ed. 1948) § 334; Garcia-Mora, "The Present Status of Political Offenses in the International Law of Extradition and Asylum," 14 University of Pittsburgh Law Review 371; Garcia-Mora, International Law and Asylum as a Human Right, Public Affairs Press, 1956, pp. 73–102.

fact that Artukovic is called a "war criminal" by appellant, we note the following facts as showing a marked degree of connection between the alleged murders and a political element. Appellee Artukovic is not charged with personally murdering anyone, rather it is charged that the murders were carried out on his "orders."[9] The Indictment accuses Artukovic "for having, in the course of 1941 and 1942, when Yugoslavia was occupied by German and Italian troops, issued orders based on criminal motives, hatred and the desire for power, to members of bands of which he was one of the leaders, to carry out mass slaughters of the peaceful civilian population of Croatia, Bosnia and Herzegovina. * * *" The Indictment states (in the Explanation of the Indictment) that the "accused Artukovic was the so-called Minister of the Interior in the 'Cabinet' of Ante Pavelic." It is also stated that "Direction and control over the concentration camps, over the internment of people in the camps and over the treatment (Point 8 of the Indictment) was discharged, along with Pavelic, by the accused Artukovic, who was the so-called Minister of the Interior in Pavelic's 'Cabinet' at that time. This has been established through numerous so-called legal and other kinds of orders which were prepared by the accused Artukovic himself, which he issued and signed alone or together with Pavelic. * * *" It is also stated that Artukovic and Pavelic prescribed a "so-called legal order on August 16, 1941, on the 'Ustasha Security Service' which under the 'Legal Order' of November 25, 1941 controlled concentration camps and passed decisions on deportations to these camps." The Indictment further states that the "crimes committed by the accused Artukovic simultaneously constitute great international crimes foreseen by International Law, specifically Law No. X of the Central Council for Germany and by Article 6 of the Statute of the International Military Tribunal * * *" The amended Complaint alleges over 200,000 murders or participations in murders.

The District Court properly took judicial notice of the fact that Ante Pavelic was the Premier of Croatia during World War II, and of the fact that various factions representing different theories of government were struggling for power during this period in Croatia. We conclude that the finding by the District Court that the offenses for which the surrender of Artukovic was sought were offenses of a political character was correct.

We now consider the question whether because the offenses are also called "war crimes" they have lost their character as "political offenses" within the meaning of the treaty. Appellant argues that "war crimes" are crimes for which extradition is to be granted within the meaning of international acts to which the United States is a party. It is argued by recent legal writers that the "barbarity and atrocity of the crimes [crimes against the law of war and crimes against humanity] committed weigh so heavily upon the common crime element that the political act has practically ceased to exist and, therefore, that the extradition of the offender is the only justifiable course of action."[10]

9. Appellant, in its brief, points out that "participation" in any of the enumerated crimes and offenses is also an extraditable offense if such participation may be punished in the United States as a felony. Article II of the treaty.

10. Garcia-Mora, International Law and Asylum as a Human Right, pp. 91–102 and particularly pp. 91–93, commented on in 24 University of Chicago Law Review 202 and 55 Michigan Law Review 618; 21 The British Yearbook of International Law (1944). 59–95, Lauterpacht; Vol. IV Oppenheim's International Law (7th Ed.1952), Lauterpacht, pp. 566–588 and particularly footnote 4, p. 588; Garcia-Mora, "The Present Status of Political Offenses," 14 University of Pittsburgh Law Review 371, 394. Cf. Neumann, "Neutral States and the Extradition of War Criminals," 45 American Journal of International Law 495.

Appellant in essence argues that by virtue of resolutions[11] taken in 1946 and 1947 by the United Nations General Assembly as to the surrender of alleged war criminals, it is incumbent on this Court to hold that Artukovic is charged with an offense which is extraditable.

We have examined the various United Nations Resolutions and their background and have concluded that they have not sufficient force of law to modify long standing judicial interpretations of similar treaty provisions. Perhaps changes should be made as to such treaties. A well-known authority[12] recently commented on the point as follows:

"It would appear that codification of offenses against the law of nations should be developed to indicate those offenses with a political aspect which should be excluded from the concept of 'political offense' and made subject to extradition to the country where the offense was committed, or to the jurisdiction of an international criminal tribunal, if such were established. * * * It

11. United Nations Resolution of February 13, 1946: (United Nations Yearbook, 1946–47, p. 66)

"The General Assembly:

"taking note of the Moscow Declaration of 1 November 1943 by President Roosevelt, Marshal Stalin and Prime Minister Churchill concerning enemy atrocities in the course of the war, and of the declaration by certain allied governments of 13 January and 18 December 1942 concerning the same matter;

"taking note of the laws and usages of warfare established by the fourth Hague Convention of 1907;

"taking note of the definition of war crimes and crimes against peace and against humanity contained in the Charter of the International Military Tribunal dated 8 August 1945;

"believing that certain war criminals continue to evade justice in the territories of certain States;

"Recommends

"that Members of the United Nations forthwith take all the necessary measures to cause the arrest of those war criminals who have been responsible for or have taken a consenting part in the above crimes, and to cause them to be sent back to the countries in which their abominable deeds were done, in order that they may be judged and punished according to the laws of those countries;

"And Calls Upon

"the Governments of States which are not members of the United Nations also to take all necessary measures for the apprehension of such criminals in their respective territories with a view to their immediate removal to the countries in which the crimes were committed for the purpose of trial and punishment according to the laws of those countries."

See also Resolution of General Assembly adopted December 15, 1946, as to the screening of displaced persons, refugees, prisoners of war and other persons of similar status, with a view to identifying war criminals, quislings and traitors. (United Nations Yearbook, 1946–47, p. 170)

Resolution of General Assembly, October 31, 1947: (United Nations Yearbook, 1947–48, p. 222)

"The General Assembly

"Noting what has so far been done in the matter of the surrender and punishment, after due trial, of the war criminals referred to in its resolution adopted on 13 February 1946,

"Reaffirms the aforementioned resolution;

"Reaffirms also its resolutions on the subject of refugees adopted on 12 February 1946 and on 15 December 1946;

"Recommends Members of the United Nations to continue with unabated energy to carry out their responsibilities as regards the surrender and trial of war criminals;

"Recommends Members of the United Nations, which desire the surrender of alleged war criminals or traitors (that is to say nationals of any State accused of having violated their national law by treason or active collaboration with the enemy during the war) by other Members in whose jurisdiction they are believed to be, to request such surrender as soon as possible and to support their request with sufficient evidence to establish that a reasonable *prima facie* case exists as to identity and guilt, and

"Reasserts that trials of war criminals and traitors, like all other trials should be governed by the principles of justice, law and evidence."

12. Quincy Wright, Professor Emeritus of International Law, University of Chicago, 24 University of Chicago Law Review 202, 206.

seems probable, however, that due process of law would be better assured if an international criminal tribunal had jurisdiction of such offenses."

Other points raised by the appellant we need not consider based on our decision.

Judgment affirmed.