628 F.Supp. 1370 (1986)
In the Matter of the EXTRADITION OF Andrija ARTUKOVIC.
Andrija ARTUKOVIC, Petitioner,
v.
Richard RISON, Warden, Respondent.
Nos. CV 84-8743-R(B), CV 85-3611-R.
United States District Court, C.D. California.
February 6, 1986.
*1371 *1372 Robert C. Bonner, U.S. Atty., Robert L. Brosio, Asst. U.S. Atty., Chief, Criminal Div. by David Nimmer, Asst. U.S. Atty., Los Angeles, Cal., and, Murray R. Stein, Associate Director, Office of Intern. Affairs, U.S. Dept. of Justice, and Ronnie L. Edelman, Trial Atty., Office of Special Investigations, U.S. Dept. of Justice, Washington, D.C., for U.S.
Gary B. Fleischman and Michael P. Dacquisto, Beverly Hills, Cal., and Ronald H. Bonaparte of Los Angeles, Cal., for respondent.

ORDER ADOPTING OPINION OF MAGISTRATE
REAL, Chief Judge.
This matter is before the court upon a Writ of Habeas Corpus in the nature of a review of the decision of Magistrate Volney V. Brown, Jr., ordering extradition of petitioner to Yugoslavia to answer charges of murder.
The court has reviewed the entire record in this matter, has considered all of the evidence and arguments submitted by the parties in the extradition hearing and with this Petition for Writ of Habeas Corpus.
IT IS ORDERED the court adopts the opinion heretofore filed by Magistrate Brown on all issues presented to him during the extradition hearing. The opinion of Magistrate Brown correctly states the law and is supported by evidence presented during the many hearings held by the magistrate. The opinion adopted is specifically that Amended Opinion filed August 9, 1985 and now instructs the Clerk to enter orders made therein as the Order of this court.
The Petition for Writ of Habeas Corpus adds nothing to the review function of this court on the extradition question.
The petition is denied.

AMENDED OPINION

August 8, 1985
VOLNEY V. BROWN, Jr., United States Magistrate.

I
The Honorable Borislav Krajina, Federal Secretary for Justice of the Federal Socialist Republic of Yugoslavia ["Yugoslavia"], by request dated July 19, 1984, sought the extradition of Andrija Artukovic ["respondent"] for prosecution in the District Court of Zagreb, pursuant to an indictment of February 29, 1984. The indictment charged "criminal offence against humanity and international lawwar crime committed against the civilian population" ["war crimes"] proscribed by Yugoslavian Article 142, recently enacted. The 1984 indictment amended and incorporated an indictment of September 4, 1951, charging murder in violation of Article 135(2) then in force, of which indictment this Court takes judicial notice from its own records in Karadzole v. Artukovic, 170 F.Supp. 383 (S.D. Calif.1959).[1]
*1373 Pursuant to a complaint for extradition filed on November 14, 1984, respondent was arrested and held without bail. The complaint alleges that he "is duly and legally charged with murder, in violation of the laws of and in the jurisdiction of the Government of Yugoslavia;" that murder "is among the offenses enumerated in Article II of the Treaty of Extradition between the United States and Servia (now Yugoslavia) of May 17, 1902, 32 Stat. 1890 ["Treaty"], which is still in full force and effect;[2] that the offense charged "is a proper ground for this Court to order extradition pursuant to Title 18, United States Code, Section 3184;" and, that respondent should therefore "be surrendered to competent authorities of Yugoslavia."
This Magistrate has jurisdiction conferred directly by the Treaty, by 18 U.S.C. § 3184, and by the Local Rules of the United States District Court for the Central District of California.

II
The following questions must be answered:
1. Does respondent possess the requisite mental competence?
2. Is the action barred by the doctrine of res judicata?

3. Was due process violated by excessive delay in refiling for extradition?
4. Is evidence offered by the Government admissible?
5. Is the political character defense applicable?
6. Is the charging document specific?

III
The facts necessary for a determination of this matter are as follows:
During World War II, the Germans and Italians invaded Yugoslavia. On April 10, 1941, at the behest of the Ustasha, a political organization which was or became armed, the Axis permitted the creation of the Independent State of Croatia. Respondent became Minister of Interior and held other high offices. There was conflict between Croatians, Serbians, Communists, Jews, Christians (Orthodox and Roman Catholic), Moslems and others, and these groups variously fought, persecuted each other and/or fled. Affidavits in evidence show that tens of thousands of atrocities were committed.
Among the older documents in evidence is the affidavit of Franjo Truhar, dated April 25, 1952 (Excerpts, Tab 10, pp. 65 et seq.). He is a self-described "Croat," who says the Ustashas made him Chief of Police in Zemun in April and May, 1941. It is his testimony that Jesa Vidic, a former national delegate, was
"imprisoned and sent at the request of Artukovic to the `Danica' camp, where he was interned for a certain time. His wife, Olga Vidic, came to see me, and that was in July 1941, with a petition addressed to Minister Artukovic in which she offered to cede 150 Jutros [acres] of land if he permitted her husband to resettle in Serbia. I brought this request in person to Artukovic in Zagreb, and handed it to him, to which he answered me: `What did you bring this petition to me for, I will kill him and take, not 150, but 300 Jutros of land.' Later Artukovic himself sent the order for Dr. JESA VIDIC to be killed, which was also carried out, and all of the land was taken and given to Ustasha Stjepan Vinek in Sremska Mitrovica."
A "new" affidavit in evidence is that of Avdic Bajro, dated July 6, 1984 (Excerpts, Tab 11, pp. 74 et seq.) Born in 1924, this witness says that, following training, in November, 1941, he was "ordered into the motorized unit of the state escort service to escort leader Pavelic, Andrija Artukovic Minister of Interior Affairs and other ministers of the NDH ... Independent State of Croatia."
"I was also present by the end of 1941 at Kresimir's Trg when an autocade of trucks full of arrested partisans, Jews and others, in my estimate some seven hundred people among them many women *1374 and small children, was taken, as I overhea[r]d Artukovic order Lahovski, to Kerestinac, the collecting camp in the vicinity of Zagreb. Artukovic followed the autocad[e] to Kerestinac and as I was his escort I heard when Andrija Artukovic told Lahovski that the back part of the autocad[e] of trucks must be disposed of because it would be too much for the camp. So women, children and men were taken out of the trucks, in my estimate some 400-500 persons and by machine-gun fire were killed by ustashas at the order of Artukovic, while the others were taken to Kerestinec camp."
This is a first-person account of the killing of certainly entirely helpless prisoners, at the direct order of respondent and in his immediate presence.
Witness Bajro also states that he accompanied the respondent and others in the beginning of 1942 to where Ustashas were carrying out a military offensive against partisans. He says that in the village of Vrgin Most respondent, "after learning that in the houses women, children and men were locked, [ordered] the tanks towards these houses, to penetrate them and destroy them completely together with all men, women and children inside...."
Continuing his testimony, witness Bajro says:
"I remember well that while returning back we visited Vrgin Most again and that corporal Stilinovic informed chiefs Pivac Oreskovic and Saric that his whole unit was destroyed, as he said, in the vicinity of Vrgin Most in the fight with partisans and that some two hundred Ustashas died. When Artukovic heard that he ordered that all the population of the nearby villages be arrested and brought into the plain, which was done and many people, women and children were killed ... by machine-gun fire of German production. Machine-guns were `sharci' having 3000 bullets in a belt. I was also escorting Pavelic and Artukovic when they were visiting the site of Kozara because they wanted to see the positions at which some 500 to 600 ustashas had died in the battle with partisans. I know that on that occasion we drove to the monastery Moscenica, a very nice monastery, and Artukovic ordered Lahovski the commander of escorts to gather all civilian population from the houses, old ones, sick, women, children and men, to gather at least five thousand of them and to kill them all because five hundred ustashas have perished in the vicinity of the Moscenica monastery. This was done and a large number of civilian population from the nearby villages was gathered, mostly women and children and shot, some of them then and there close to the monastery and some of them were taken away and killed later on."
These deaths on the return to Vrgin Most, and of civilians gathered from the vicinity of the monastery Moscenica, were not in the course of military action, but of persons "arrested" or "gathered" and, therefore, not a military threat.
The pertinent testimony of witness Bajro concludes with these words:
"I remember well that at the beginning of the year 1943 I was escorting Pavelic and Artukovic when they went to Samobor and on that occasion we came to a castle where some several hundreds of partisans, men and women, were imprisoned I know well that the commander of operative groups of ustashas informed Artukovic and Pavelic that partisans were captured at Zumberk and Artukovic together with Pavelic ordered then, they both ordered, that all partisans imprisoned there, be killed which was done during that day and night and I have been present there. They were killed in such a way that they were taken to the field, tied and killed by machine-gun fire while some of them were passed over by tanks."
Respondent is now an older man, born on or about November 19, 1899. He suffers from a number of serious medical conditions, for which, since his arrest, he has received superb medical treatment, first at the Los Angeles CountyU.S.C. Hospital, and then at the United States Naval Hospital *1375 at Long Beach. On the question of his competence, medical reports were received, physicians testified and the Magistrate personally observed respondent in the courtroom. His health has improved markedly since his arrest. Where before he was usually confused, during the daytimes he is now usually alert. Where before he was bedridden and had bed sores, he now walks, climbs stairs and has healed.

IV

1. Does Respondent Possess the Requisite Mental Competence?
It is necessary that respondent, first, be competent to assist in the preparation of his own defense. He has been sufficiently competent in this respect, according to the reports and testimony of his attending Navy physician, Dr. Hill, and of the court's own appointed Psychiatrist. It is necessary that respondent, second, be competent during the hearings. The required standard is set forth in Chavez v. United States, 641 F.2d 1253, 1259 (9th Cir.1981): he must be able to understand the nature of the proceedings and to participate intelligently to the extent his participation is required. Again, evidence and observation show the requisite mental abilities.
The Government's contention that the competence of Mr. Artukovic "is not a proper subject of inquiry in this extradition matter" is rejected. The Sixth Amendment guarantees him, as all persons before the court in matters affecting life and liberty, the effective assistance of counsel. Meaningful consultation between attorney and client is an essential element of competent representation. United States v. Tucker, 716 F.2d 576, 581 (9th Cir.1983). Furthermore, respondent's Fifth Amendment right to a fair hearing requires that he be shown to have the minimum competence defined in Chavez. Pate v. Robinson, 383 U.S. 375, 385, 86 S.Ct. 836, 842, 15 L.Ed.2d 815 (1966).

2. Is the Action Barred by the Doctrine of Res Judicata?

In 1959, Commissioner Theodore Hocke rejected much of the evidence presented herein and denied the application for extradition. See Karadzole v. Artukovic, supra, 170 F.Supp. 383 (S.D.Calif.1959).
Respondent contends that res judicata requires dismissal of this action. The Magistrate has, however, rejected respondent's motion to dismiss on this ground. The principle of res judicata is not applicable to international extradition proceedings. Hooker v. Klein, 573 F.2d 1360, 1368 (9th Cir.1978), cert. denied, 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978).

3. Was Due Process Violated by Excessive Delay in Refiling for Extradition?
Respondent further contends that due process was violated by a delay of 25 years in refiling for extradition. This contention is without merit. Due process may require dismissal of charges if it is shown that a pre-indictment delay caused substantial prejudice to the respondent's rights to a fair trial and that the delay was intentional so as to gain a tactical advantage over the accused. United States v. Marion, 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971). But the focus of inquiry must be whether the United States, not Yugoslavia, acted unconstitutionally. Matter of Burt, 737 F.2d 1477, 1487 (7th Cir.1984). Respondent has not sustained his burden of proving either prong of the Marion rule.
Permitted to question, as on cross-examination, Neal Sher, Chief of the Office of Special Investigations, Criminal Division, United States Department of Justice, made available as a witness at the Court's request, respondent's counsel succeeded in showing only that the instant extradition action was indeed initiated at Yugoslav instance. There is no evidence, nor indeed suspicion, that the United States Government, or any of its agents, has been guilty of any wrongful conduct in connection with the instigation of this proceeding. Respondent may, of course, present the question of unfairness occasioned by a proposed *1376 prosecution more than forty years after the events mentioned in the indictment to the Secretary of State and, if necessary, to the Yugoslav court.

4. Admissibility of the Government's Evidence.
Respondent has moved to dismiss on the ground that the Government impermissibly introduced Yugoslavian Article 167 during rebuttal. This motion was denied, because the Government was permitted to reopen for this purpose, and because evidence that murder was proscribed in Yugoslavia at all pertinent times is otherwise before the Court. That Article 167 does not address aiding and abetting is irrelevant, in view of the provisions of Article II of the Treaty as to "participation" in enumerated crimes.
The Government, on behalf of Yugoslavia, has offered translations into English which have not been certified by the American Ambassador under 18 U.S.C. § 3190, although the Serbo-Croatian originals were. Respondent argues that these translations are, therefore, inadmissible. While § 3190 makes evidence certified as admissible in the tribunals of the requesting country admissible in our courts, it is not true that the Government may introduce evidence only by way of such certification. The English translations may be proved as any other fact. Respondent may challenge the accuracy of the Government's translations and/or offer his own. In re Extradition of David, 395 F.Supp. 803, 806 (E.D.Ill.1975), aff'd sub nom. David v. Attorney General, 699 F.2d 411 (7th Cir.1983), cert. denied, 464 U.S. 832, 104 S.Ct. 113, 78 L.Ed.2d 114 (1983).

5. Political Offense Exception to Extradition
To successfully assert the "political character" defense, respondent must show that there was a political uprising or disturbance at the time of the offense and that the offense charged was "incidental" to, or part of the political disturbance. Eain v. Wilkes, 641 F.2d 504, 515-16 (7th Cir.1981), cert. denied, 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); In re Castioni, [1891] 1 Q.B. 149. Evidence of record amply supports the finding that uprisings and disturbances, within the meaning of the defense exception, existed in Croatia during all pertinent times. Nevertheless, respondent cannot avail himself of the defense merely because the alleged crimes occurred at the same time as a political disturbance. A rational nexus between the alleged crimes and the prevailing turmoil must be demonstrated. In searching for such a connection, the focus of inquiry is on the circumstances, and on the status of those harmed, and not on whether the acts merely were committed during the disorder. See Ornelas v. Ruiz, 161 U.S. 502, 511, 16 S.Ct. 689, 692, 40 L.Ed.2d 787 (1896), where the Supreme Court concurred in the magistrate's refusal to apply the exception "in view of the character of the foray, the mode of attack, the persons killed or captured, and the kind of property taken or destroyed." [Emphasis added]
Those murders as to which it is hereinafter found there is probable cause to believe respondent committed do not come within the "political character" defense. Respondent's statement of his motives would be irrelevant. Eain, supra, 641 F.2d at 520. ("[F]or purposes of extradition, motivation is not itself determinative of the political character of any given act.") The facts and circumstances in evidence show that the murders were not of a "political character" within the meaning of the Treaty; they were for personal gain, racial or religious hatred, and/or impermissible vengeance upon disarmed enemy soldiers. Ridding a country of some of its population for such reprehensible reasons, as part of some larger political scheme, is not a crime of a "political character" and is thus not covered by the political offense exception to extradition. Eain, supra, 641 F.2d at 521.

6. Specificity in the Charging Document
The Magistrate must make a determination as to whether each specific charge forms the basis for extradition, at least *1377 where, as here, the Treaty incorporates the principles of "dual criminality" and "specialty." Caplan v. Vokes, 649 F.2d 1336, 1343 (9th Cir.1981). Thus there must be a focus on each count of the foreign indictment, complaint, warrant, summons, or other charging document. As is more fully discussed in the Order filed March 4, 1985, the Government's argument that prefatory language in the 1984 Yugoslavian indictment will support extradition for alleged murders of other than Dr. Vidic is rejected. Such language is not specific enough to permit this court to analyze dual criminality sufficiently, or to ensure that the principle of specialty will be honored.

V
Preliminarily, it is noted that, by its instant request, Yugoslavia seeks to extradite the respondent to try him for the war crimes proscribed by Article 142, enacted long after the last of the alleged crimes was committed. That respondent could not be prosecuted under such an ex post facto law in this country is not significant in this proceeding: due process cannot be extended extraterritorially. Kamrin v. United States, 725 F.2d 1225, 1228 (9th Cir.1984), cert. denied, ___ U.S. ___, 105 S.Ct. 85, 83 L.Ed.2d 32 (1984), citing Neely v. Henkel, 180 U.S. 109, 21 S.Ct. 302, 45 L.Ed. 448 (1901). What is significant is that extradition can be achieved only for crimes mentioned in the Treaty. Fernandez v. Phillips, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925); cf. Hooker v. Klein, supra, 573 F.2d at 1368. War crimes mentioned in the Treaty. Fernandez v. Phillips, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925); cf. Hooker v. Klein, supra, 573 F.2d at 1368. War crimes are not mentioned in the Treaty. Even if they were, the principle of "dual criminality," incorporated in Article I of the Treaty, would not permit extradition for war crimes. Under "dual criminality," one can be extradited only if the offense charged in the requesting country is an offense in the place where the fugitive is found. Collins v. Loisel, 259 U.S. 309, 312, 42 S.Ct. 469, 470, 66 L.Ed. 956 (1922). "War crimes" are not proscribed in California or the United States. For the same reasons, illusions to "genocide," as such, in the requesting papers and evidence, are irrelevant.
Implicitly recognizing the above, the Government seeks to extradite respondent only for "murder." At all pertinent times, murder has been a felony in California (Penal Code Sections 187 et seq.) and the United States. 18 U.S.C. § 1111. The Magistrate finds, from the testimony of the historian witnesses, that murder was proscribed by the government immediately preceding that of the Independent State of Croatia, and that this proscription was continued in effect during all pertinent times. Then and there respondent was protected by sufficient force, so that the laws under which he lived and acted were at no time those of military forces other than his own, such as those of the Axis powers. Furthermore, the present Federal Socialist Republic of Yugoslavia proscribed murder no later than September, 1951 (see indictment at Excerpts, page 160) by means of Article 135, in evidence herein.[3] As has been shown, it is not an obstacle in this proceeding, although it may be in Yugoslavia, that Article 135 may be an ex post facto law as to the crimes charged against respondent. As to murder charges, therefore, the Treaty requirements are satisfied.

VI
The Magistrate finds:
Much of the evidence presented herein apparently was rejected by Commissioner Theodore Hocke in 1959. Karadzole v. Artukovic, supra, 170 F.Supp. 383 (S.D.Calif. 1959). While such evidence raised the suspicion that the respondent participated in the creation and/or maintenance of concentration camps where predominantly Jews, Serbs, and Gypsies, women and children as *1378 well as men, were killed or permitted to die, it does not begin to rise to the level of probable cause which must be proved before an extradition can be certified. Other evidence, consisting of respondent's alleged proclamations and racist speeches, does not even raise a suspicion of extraditable misconduct, although it merits the opprobrium of all decent people. As to this evidence, which forms the great bulk of the material admitted herein, the words of Mr. Chief Justice Holmes in Glucksman v. Henkel, 221 U.S. 508, 512, 31 S.Ct. 704, 705, 55 L.Ed. 830 (1911) are apposite:
"[O]f course a man is not to be sent from the country upon demand or surmise," but instead only upon "such reasonable grounds to suppose him guilty as to make it proper that he should be tried...."
The affidavit of Franjo Turhar supplies ample probable cause to believe that respondent "participated" (Treaty, Article II, subd. 12) in the crime of murder of Jesa Vidic, extradictable under Treaty, Article II, and accordingly he should be extradited to face this single charge, which is found in the 1984 indictment, page 200 of Excerpts.
The engagement on the first described visit to Vrgin Most appears to have been a prototypical military operation against an armed enemy. It is by no means certain that armed women, as well as men, were not among the partisans opposing respondent's troops. That some noncombatants may have been killed incidental to a military operation does not constitute murder. Upon his extradition, respondent may not be tried for these deaths at Vrgin Most.[4]
The affidavit of Avdic Bajro provides overwhelming probable cause to believe that respondent was directly responsible for the 400 to 500 killings of helpless prisoners at Kresimir's Trg, the deaths on the return to the vicinity of Vrgin Most, the deaths of the civilians gathered from the vicinity of the Monastery Moscenica, and the killing of the several hundred partisans of the castle near Samobor; and that he should accordingly be extradited to face a murder charge for each of these deaths, if they are alleged in a charging document before this Court.

VII

Disposition
The United States Attorney shall prepare a form of certificate for the crime of murder of Jesa Vidic for the Magistrate's signature. The effect of said certificate, however, is stayed to and including May 3, 1985, during which time the Court retains jurisdiction in this action. If, during the period of the stay, the Government serves and files an amended indictment, complaint, warrant or other charging document of Yugoslavia, duly certified and transmitted, alleging the crime of murder against respondent for each or any of the murders (other than that of Vidic) as to which it has been found there is probable cause to believe were committed by respondent, the Magistrate intends to certify these additional charges for extradition and trial. Upon such filing, respondent shall be afforded a hearing on the question of "dual criminality" and the form and content of any proposed further certificate for extradition.

Supplemental Proceedings
The Government timely filed a Submission of Supplemental Certified Documents containing, inter alia, an Amendment of Indictment, dated March 26, 1985, from the District Court of Zagreb, Yugoslavia. A hearing was held on the matter on May 1, 1985.
Respondent's counsel expressly refused to waive his presence, and the respondent was present throughout the hearing. After the proffer of evidence by each party on the question of respondent's then competence, the Magistrate's own observations, *1379 and oral argument, it was held that respondent was no less competent than during the evidentiary stages of the proceedings, when he was shown competent by medical evidence.
In the supplemental papers, Yugoslavia provided information which neither the Court nor the Government had requested. Held: only evidence of those laws and statutes of Yugoslavia and predecessor governments, which was introduced and argued at the earlier probable cause hearings, will be taken into account by the Magistrate.
An Amended Certificate of Extraditability is ordered filed and forwarded to the Secretary of State. The Amended Certificate is expressly limited to the following charges of murder:
Dr. Jesa Vidic;
Between four and five hundred persons murdered by machine-gun fire, after being removed by autocade from Kresimir's Trg towards Kerestinec, in late 1941;
The entire civilian population of several villages near Vrgin Most, murdered in a nearby valley by machine-gun fire in early 1942;
Approximately five thousand (5000) persons, murdered by rifle fire and otherwise near the Moscenica monastery in the Kozara region in 1942; and
Several hundred persons, captured in the Zumberg region, murdered by machine-gun fire and by being crushed under moving tanks, in the vicinity of Samobor Castle, in early 1943.
NOTES
[1] The following is the published chronology in this matter. Artukovic v. Boyle, 107 F.Supp. 11 (S.D.Cal.1952), rev'd sub nom. Ivancevic v. Artukovic, 211 F.2d 565, (9th Cir.1954), cert. denied, 348 U.S. 818, 75 S.Ct. 28, 99 L.Ed. 645 (1954), rehearing denied, 348 U.S. 889, 75 S.Ct. 202, 99 L.Ed. 645 (1954); Artukovic v. Boyle, 140 F.Supp. 245 (S.D.Cal.1956), aff'd sub nom. Karadzole v. Artukovic, 247 F.2d 198 (9th Cir.1957), vacated, 355 U.S. 393, 78 S.Ct. 381, 2 L.Ed.2d 356 (1958), decision on remand, supra, 170 F.Supp. 383 (S.D.Cal.1959).
[2] Ivancevic v. Artukovic, supra, 211 F.2d at 573.
[3] Article 135 provides in pertinent part: "(2) Whosoever takes the life of another in a cruel or treacherous way, or in such a way as to cause endangerment to the life of many persons, or for gain, or for the purpose of committing or covering up another criminal act, or for other vile motives, or whosoever takes the lives of several persons, shall be punished by imprisonment fot at least 10 years or by death sentence."
[4] Respondent attempted to show that tanks were unavailable to him, for which reason the testimony of Bajro is untrustworthy. Such evidence, however, is unconvincing and does not "explain" why the evidence of this witness should be rejected.