**In the Matter of the EXTRADITION OF Sulejman MUJAGIC.**

**Criminal Action No. 5:12–MJ–0529 (DEP).**

United States District Court, N.D. New York.

April 2, 2013.

**210**

Richard S. Hartunian, Carla B. Freedman, Esq., Assistant U.S. Attorney, United States Attorney for the Northern District of New York, Syracuse, NY, Ivana A. Nizich, Esq., U.S. Department of Justice, Washington, DC, for the United States.

Lisa A. Peebles, Acting Federal Public Defender, Randi Juda Bianco, Esq., Assistant Federal Public Defender, Syracuse, NY, for Sulejman Mujagic.

### *DECISION, ORDER, AND CERTIFICATE OF EXTRADITABILITY*

DAVID E. PEEBLES, United States Magistrate Judge.

The government of Bosnia and Herzegovina ("BiH") has formally requested the extradition of Sulejman Mujagic, who is a lawful permanent resident of this country, pursuant to a treaty in effect between the United States and BiH, so that he may stand trial for the alleged murder of one unarmed enemy combatant and the torture of another during the course of hostilities within BiH in the 1990s. That request, in turn, has precipitated the filing of a complaint in this court by the United States, pursuant to 18 U.S.C. § 3184, seeking the issuance of an arrest warrant for Mujagic, and requesting that the court conduct proceedings to determine whether to certify to the United States Department of State ("Department of State") that the requirements for extradition under the applicable treaties have been met.

Having considered the properly authenticated documents now before the court, and after hearing oral argument concerning BiH's request, I conclude that the requirements for extradition have been satisfied. Accordingly, I now certify that fact to the Department of State, with whom the final determination as to whether extradition should be granted rests.

## I. BACKGROUND

### A. *Underlying Facts*

In or about 1990, BiH, formerly a part of the Socialist Federative Republic of Yugoslavia ("SFRY"), declared its independence and established its own government and army. Memorandum in Support of Extradition (Dkt. No. 2) at P24; Compl. Exh. (Dkt. No. 1–1) at 99.[1] Various dissident groups, including Serbs, Croats, and certain Bosnian Muslims opposed the independence of BiH, separated from the central BiH authorities in Sarajevo in or

---

**1.** The formal extradition request from BiH to the United States is included both as an attachment to the complaint, Dkt. No. 1, and as an exhibit to the government's memorandum in support of extradition, Dkt. No. 2. Because the version annexed to the government's memorandum, Dkt. No. 2, is paginated, citations to the extradition request in this decision will be made to that document, and cited as "Extradition Request," using the assigned Bates numbers (*e.g.,* "Extradition Request at P1").

about April 1992, and fought against BiH forces. Extradition Request at P24. Among those dissidents were residents of northwestern BiH, who proclaimed independence from the BiH government, established a state known as the Autonomous Province of Western Bosnia ("APZB"), and formed their own army. *Id.*

At the relevant times, Sulejman Mujagic, a citizen of BiH born in Gornja Slapnica, in the municipality of Velika Kladusa, served as a commander of the 2nd Battalion of the 1st Brigade of the APZB army. Extradition Request at P8, P20, P24, P38. Mujagic and his troop were among those engaged in a conflict with the BiH army on March 6, 1995, in the area of Kumarice, east of Velika Kladusa, in northwestern BiH. *Id.* at P8. During the fighting, three members of the BiH army, including Ekrem Baltic, Nisvet Cordic, and a third unnamed soldier, were taken prisoner and disarmed by Mujagic and other APZB militants. *Id.*

Following their surrender and disarmament, Baltic, Cordic, and the third soldier were interrogated, beaten, kicked, and struck with rifle stocks by Mujagic and other soldiers under his command. Extradition Request of P10, P24, P30. After Baltic refused Mujagic's demand that he disclose the name of his commander in the BiH army, Mujagic summarily shot and killed him by firing five or six bullets at close range with an automatic assault rifle into his chest. *Id.* at P10, P24, P29. Mujagic and the other APZB soldiers then turned to Cordic and the third soldier, and resumed beating them. *Id.* at P12, P24, P30. Mujagic shot Cordic in the lower leg and kicked the area of the gunshot wound after Cordic fell to the ground. *Id.* As a result of the assault, Cordic suffered a broken shin bone. *Id.* Mujagic then ordered Cordic to crawl up a nearby hill, during which time Mujagic and his fellow APZB combatants fired multiple bullets towards Cordic, resulting in additional injuries to his back and leg. *Id.* at P13, P24. When Cordic finally managed to successfully crawl up the hill, he was beaten again by Mujagic, and denied medical care. *Id.* at P14–15.

Immediately following the end of hostilities in BiH, Mujagic escaped, initially to Croatia in August of 1995, and later to the United States in 1997.[2] Extradition Request at P18. At the time the government of BiH made its extradition request, Mujagic was living in Utica, New York, within this district. *Id.* at P20.

## B. *Proceedings in BiH*

On May 11, 1996, criminal charges were filed against Mujagic, alleging the unlawful killing of Baltic and wounding of Cordic, in violation of Article 146 of the Criminal Code of SFRY.[3] Extradition Request at

---

**2.** In its memorandum, the United States asserts that Mujagic became a lawful permanent resident of this country on March 5, 2001, but is not a United States citizen. Government's Memo. of Law (Dkt. No. 2) at 5. Mujagic does not contest these representations.

**3.** The Criminal Code of SFRY was in force in BiH at the time Mujagic allegedly committed the crimes for which he charged, and it remains in use for the prosecution of war crimes in BiH. Dkt. No. 19 at 1–2; Dkt. No. 24 at 9–10. Some confusion arises, however, from the fact that, although the initial charg-

ing document from 1996 charged Mujagic under Article 146 of the Criminal Code of SFRY, subsequent documents from the Cantonal Court in BiH reference Article 158 of the Federation Criminal Code. Extradition Request at P59, P60, P61, P62, P65, P66, P67. The Federation Criminal Code was adopted by one of the two formal entities created by the Dayton Accords, which ended the conflict in BiH in 1995. Dkt. No. 19 at 2. The Federation Criminal Code was promulgated in 1998, and was superseded by a new one in 2003. Dkt. No. 19 at 2. In any event, Article

P29–31. The document lodging those charges is signed by Edham Veladzic, who is identified as the Head of Center of Security Services, Criminal Police Department for the BiH Ministry of Interior, and is addressed to the Supreme Public Prosecutor's Office. *Id.* at 31. The charges were then forwarded to an investigating judge of the Federation of BiH Cantonal Court in Bihac on August 27, 1996, for the purpose of commencing the judicial phase of proceedings against Mujagic based upon the underlying charges. *Id.* at P32–33.

Following an investigation by the Cantonal Court in Bihac, a decision was issued on April 19, 2001, in which the court found "reasonable doubt" to conclude Mujagic violated Article 158 of the Federation Criminal Code by the killing and wounding of an enemy. Extradition Request at P32–P33. On January 22, 2008, the Cantonal Court in Bihac ordered Mujagic's arrest and detention based on its finding that reasonable doubt supported the allegations that he violated Article 158 of the Federation Criminal Code. *Id.* at P27–28. On that same date, the court also entered an order authorizing the issuance of an international warrant for Mujagic's arrest. *Id.* at P35–37. Although the materials submitted in support of BiH's extradition request does not include the warrant actually issued in accordance with this decision, on February 14, 2013, the United States filed an INTERPOL diffusion notice dated February 15, 2008, which is claimed to be the equivalent of an arrest warrant.[4] Dkt. No. 23.

## C. Summary of Investigations

Included in the record now before the court are reports of investigations conducted by both the BiH authorities and representatives of the United States Department of Homeland Security concerning the accusations against Mujagic. The results of an investigation by BiH authorities are reported in the extradition request. An independent investigation was conducted by Ingolf C. Hack, a special agent employed by the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), to determine whether probable cause exists to support the charges against Mujagic. The results of Special Agent Hack's investigation are recounted in the extradition request, Extradition Request at P23–26, and separately in his affidavit dated August 20, 2012, and received as part of Government's Exhibit No. 1 during the recent hearing.[5]

---

146 of the Criminal Code of SFRY and Article 158 of the Federation Criminal Code are identical for all practical purposes. *Id.* at 2–3. Despite this confusion over whether Mujagic is charged under Article 146 of the Criminal Code of SFRY or Article 158 of the Federation Criminal Code, I am persuaded that Article 146 of the SFRY applies in this case, and will be applied against Mujagic upon return to BiH. Dkt. No. 24 at 9–10; Dkt. No. 19 at 2.

4. By its express terms, the order dated January 22, 2008, provides that the international arrest warrant that it authorizes expires after five years, although it authorizes an extension of the warrant for an unspecified amount of time. *See* Extradition Request at P36 ("[A]fter [the five years expires], the warrant should be prolonged."). By a properly authenticated communication received by the court on February 22, 2013, a BiH deputy prosecutor noted that, notwithstanding the expiration of the international warrant, the detention decision issued on January 22, 2008 (No. 001–0–KPP–08–000 001), "still remains in force." Dkt. No. 25–1 at 1. The court has also been advised through appropriate channels that, on February 15, 2013, the Cantonal Court in Bihac again authorized the issuance of an international warrant for Mujagic's arrest based upon the crimes now charged. *Id.* at 3. In any event, the potential significance of BiH's failure to provide a warrant in support of its treaty-based request for extradition will be discussed more completely below. *See* 220–22, *post.*

## II. PROCEDURAL HISTORY

### A. Formal Request for Extradition

On May 24, 2012, the BiH Ministry of Justice presented a formal request to the United States for the extradition of Mujagic pursuant to a treaty between the United States and the Kingdom of Servia for the Mutual Extradition of Fugitives from Justice, signed in October 1901, and entered into force on July 12, 1902 ("1902 Treaty").[6] Extradition Request at P2–5.

### B. Proceedings in This Court

On November 27, 2012, the United States filed a complaint with this court initiating proceedings pursuant to 18 U.S.C. § 3184 in connection with BiH's request for the extradition of Mujagic. Dkt. No. 1. Accompanying that complaint were a legal memorandum, the formal documents submitted in support of that request, and various other relevant materials, including a copy of the 1902 Treaty. Dkt. Nos. 1, 2. At the United States government's request, following commencement of these proceedings, a warrant was issued for Mujagic's arrest. Dkt. No. 3.

Mujagic was arrested in Utica, New York, and brought before the court on November 28, 2012, at which time he was advised of his rights and the process that would be followed to address BiH's request for extradition, and was assigned counsel. A hearing was subsequently conducted on December 6, 2012, to address Mujagic's request for release on conditions, pending an extradition hearing. Mujagic's request for release was denied by written order issued on December 6, 2012, incorporating by reference a bench decision issued on that date detailing the court's rationale for denying his request. Dkt. No. 13.

Following the receipt of Mujagic's memorandum in opposition to extradition, Dkt. No. 14, a reply memorandum and a supplemental submission from the United States government, Dkt. Nos. 16, 19, I conducted an extradition hearing on February 7, 2013. At the close of that hearing, decision was reserved, and the parties were advised that the court would issue a written decision addressing the government's application and, if appropriate, certify Mujagic's extraditability to the Department of State.

## III. DISCUSSION

### A. Legal Standard Governing Extradition

#### 1. Overview

■ "The power to extradite derives from the President's power to conduct foreign affairs." *Martin v. Warden, Atlanta*

---

**5.** Special Agent Hack's affidavit is also attached as an exhibit to the complaint in this matter. Compl. Exh. (Dkt. No. 1–1) at 24–27.

**6.** The 1902 Treaty was originally entered into between the United States and the Kingdom of Servia. *In re Extradition of Handanovic*, 829 F.Supp.2d 979, 984 (D.Ore.2011). The Kingdom of Servia was expanded in 1918, and the new Kingdom of Serbs, Croats and Slovenes was formed, "which included the territory of what is now [BiH] (formerly part of the Austro–Hungarian Empire)." *Extradi-*

*tion of Handanovic*, 829 F.Supp.2d at 984. In 1920, the Kingdom of Serbs, Croats and Slovenes was renamed the Kingdom of Yugoslavia, and was later again renamed in 1946, following World War II, to the Federal People's Republic of Yugoslavia. *Id.* In 1963, the Federal People's Republic of Yugoslavia was renamed the SFRY, and included six distinct republics, including Slovenia, Croatia, Serbia, BiH, Montenegro, and Macedonia. *Id.* Finally, in 1992, BiH declared its independence from the SFRY after a period of civil wars resulting in SFRY's disintegration. *Id.*

*Penitentiary,* 993 F.2d 824, 828 (11th Cir. 1993) (citing, *inter alia,* U.S. Const. art. II § 2, cl. 2). Because a request by a foreign government for extradition presents a matter of executive branch concern, it is the Secretary of State who possesses the final authority for determining whether a fugitive should be surrendered to a requesting country. 18 U.S.C. § 3186; *see United States v. Kin–Hong,* 110 F.3d 103, 109 (1st Cir.1997) ("It is within the Secretary of State's sole discretion to determine whether or not the relator should actually be extradited."); *see also Hoxha v. Levi,* 465 F.3d 554, 560 (3d Cir.2006); *Martin,* 993 F.2d at 828. When presented with an extradition request, the Secretary of State is vested with broad discretion in responding. *Kin–Hong,* 110 F.3d at 109–10. In exercising that discretion, the Secretary may decline to extradite on a variety of grounds, including humanitarian or foreign policy considerations. *Id.* Additionally, in the event the Secretary orders extradition, he may attach conditions to the order, or he may "elect to use diplomatic methods to obtain fair treatment for the [fugitive]." *Id.*

█ Despite the fact that extradition ultimately implicates a matter of international diplomacy, Congress has assigned the courts a role in the extradition process. 18 U.S.C. § 3184; *see Hoxha,* 465 F.3d at 560. The court's authority under section 3184 is typically invoked by the filing of a complaint by the appropriate United States Attorney's Office, in the name of the United States, acting on behalf of the requesting government, which is the real party in interest. *Skaftouros v. United*

*States,* 667 F.3d 144, 154 n. 15 (2d Cir. 2011). Upon the filing of such a complaint, the court's involvement is limited to conducting a hearing to determine whether the evidence supporting the fugitive's criminality "sustain[s] the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 1384; *Skaftouros,* 667 F.3d at 154. If the court finds sufficient evidence, it "shall certify the same, together with a copy of all the testimony taken . . ., to the Secretary of State." 18 U.S.C. § 1834; *In re Extradition of Kapoor,* No. 11–M–0456, 2012 WL 1318925, at *1 (E.D.N.Y. Apr. 17, 2012). Once the court has fulfilled its obligations under section 3184, its initial role is ended, and the matter is relegated to the discretion of the executive branch.[7] *Skaftouros,* 667 F.3d at 154.

### 2. *Standard for Certification of Extraditability*

█ In performing its assigned task, the court must determine whether (1) a valid treaty exists, (2) the crime charged is covered by the applicable treaty, and (3) the evidence supplied by the requesting government is sufficient under section 1384. *Skaftouros,* 667 F.3d at 154–55 (citing *Cheung v. United States,* 213 F.3d 82, 88 (2d Cir.2000)); *Extradition of Kapoor,* 2012 WL 1318925, at *2. "An extradition hearing is not the occasion for an adjudication of guilt or innocence." *Melia v. United States,* 667 F.2d 300, 302 (2d Cir.1981); *see also Jhirad v. Ferrandina,* 536 F.2d 478, 482 (2d Cir.1976) ("Orders of extradition are sui generis. They embody no judgment on the guilt or innocence of the accused but serve only to insure that his

---

7. This is not to say that a court may not be called upon to perform any further function in connection with an extradition proceeding. While extradition orders are not final decisions, and thus are not directly appealable as a matter of right, a fugitive may seek judicial review of an extradition order by filing a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. *Skaftouros,* 667 F.3d at 157; *Hoxha,* 465 F.3d at 560 (citing *Sidali v. I.N.S.,* 107 F.3d 191, 195 (3d Cir.1997)); *Murphy v. United States,* 199 F.3d 599, 601 n. 1 (2d Cir.1999); *Ahmad v. Wigen,* 726 F.Supp. 389, 395 (E.D.N.Y.1989).

culpability will be determined in another and, in this instance, a foreign forum."). Rather, a court focuses on whether the evidence supporting the criminal charges gives rise to probable cause—the same standard that is used in federal preliminary hearings. *Skaftouros*, 667 F.3d at 155; *Hoxha*, 465 F.3d at 561; *see also Extradition of Kapoor*, 2012 WL 1318925, at *4 ("The limited purpose of an extradition hearing is to determine whether the requesting country has presented sufficient evidence to justify holding the extraditee to answer the charges pending against him.").

■ In an extradition hearing, the evidentiary rules customarily associated with criminal litigation do not apply. *Messina v. United States*, 728 F.2d 77, 80 (2d Cir. 1984). More specifically, a fugitive in such a proceeding does not have a right to confront and cross examine witnesses, *Messina*, 728 F.2d at 80, and the court may consider hearsay evidence, *United States ex rel. Klein v. Mulligan*, 50 F.2d 687, 688 (2d Cir.1931), or rely on unsworn statements of absent witnesses, *Collins v. Loisel*, 259 U.S. 309, 317, 42 S.Ct. 469, 66 L.Ed. 956 (1922). In making its determination, the court considers any properly authenticated documents presented on behalf of a requesting country. 18 U.S.C. § 3190. At the court's discretion, the fugitive may also be permitted to submit some evidence, although any evidence offered must be limited to that which is considered to be explanatory, rather than contradictory.[8] *See Hoxha*, 465 F.3d at 561 ("Courts have traditionally distinguished between

inadmissible 'contradictory evidence,' which merely conflicts with the government's evidence, and admissible 'explanatory evidence,' which entirely eliminates probable cause."); *see also Skaftouros*, 667 F.3d at 155, n. 16.

### B. *Admissibility of Mujagic's Exhibits A and B*

As an initial, threshold matter, the court must address Mujagic's proffer of two exhibits into evidence during the course of the recent extradition hearing. Those exhibits are comprised of what purports to be an excerpt from the Criminal Procedure Code of BiH, published from the "Official Gazette" of BiH and dated March 2003 (Exhibit A), Dkt. No. 20, and what appears to be an excerpt from an unfamiliar website, http://www.tuzilastvovih.gov.ba, entitled "Public Relations: Frequently Asked Questions" (Exhibit B), Dkt. No. 21.

■ Although courts are not bound by traditional rules of evidence in extradition proceedings, as was discussed above, the parties' proffers are restricted in some respects. *See, e.g.*, 18 U.S.C. § 3190 (requiring that evidence proffered be properly authenticated); *Hoxha*, 465 F.3d at 561 (explaining the parameters of a fugitive's evidentiary proffer). In this instance, I decline Mujagic's proffer of Exhibits A and B for two reasons. First, those exhibits represent Mujagic's effort to contradict, rather than merely explain, the evidence offered by the government in this case. Specifically, both documents were offered as evidence that the 1996 charging document, which BiH contends tolls the gov-

---

**8.** As one court has observed,

[t]he distinction between 'contradictory evidence' and 'explanatory evidence' is difficult to articulate. However, the purpose behind the rule is reasonably clear. In admitting 'explanatory evidence,' the intention is to afford an accused person the opportunity to present reasonably, clearcut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause. The scope of this evidence is restricted to what is appropriate to an extradition hearing. The decisions are emphatic that the extraditee cannot be allowed to turn the extradition hearing into full trial on the merits. *Matter of Sindona*, 450 F.Supp. 672, 685 (S.D.N.Y.1978).

erning statute of limitations, does not constitute the equivalent of an information or indictment under United States law. Dkt. No. 24 at 27–33. Mujagic argues that, if the 1996 charging document is not signed by an attorney pursuant to Rule 7 of the Federal Rules of Criminal Procedure or is not the equivalent of an information, it cannot toll the statute of limitations. *Id.* Again, although the lines between what constitutes "explanatory" versus "contradictory" evidence is not precisely clear under the relevant case law, in this instance, I conclude that the evidence proffered by Mujagic purports to contradict BiH's evidence supporting its request for extradition.

Moreover, even if I was to find that the evidence proffered is explanatory, it still would not be admissible because it is not properly authenticated pursuant to 18 U.S.C. § 3190. Indeed, the source of those documents is entirely unclear from the record, which creates a lack of foundation necessary to assure authenticity, reliability, and applicability. In addition, I note that Mujagic has failed to submit evidence to show that the contents of the proffered exhibits are applicable either to the specific charges filed against Mujagic or the procedures that BiH will follow upon Mujagic's return. Accordingly, Mujagic's offer of Exhibits A and B into evidence is denied.

C. *The Court's Findings*

1. *The Court's Authority and Jurisdiction to Conduct Extradition Proceedings* [9]

■ As it relates to the court's authority, in pertinent part, the statute governing extradition proceedings in the United States empowers "any magistrate judge authorized to do so by a court of the United States" to conduct the proceedings prescribed and make the requested certification, if deemed appropriate. 18 U.S.C. § 3184; *see also Extradition of Azra Basic,* No. 11–MJ–5002, 2012 WL 3067466, at *3 (E.D.Ky. July 27, 2012) ("Section 3184 specifically empowers a United States Magistrate Judge to receive a complaint for extradition, conduct the required hearing, and make appropriate findings."). In addition, the local rules of this court specifically authorize magistrate judges to conduct extradition proceedings pursuant to 18 U.S.C. § 3184. N.D.N.Y. L.R. (Criminal) 58.1(a)(2)(B). For these reasons, I find that I have the authority to hold extradition proceedings in this case.

As it relates to jurisdiction, section 3184 permits a court to conduct extradition proceedings with respect to any person found within its jurisdiction. 18 U.S.C. § 3184; *see also Extradition of Azra Basic,* 2012 WL 3067466, at *3 ("[Section 3184] extends authority to 'any person within his [the judge's] jurisdiction.'"). In this instance, Mujagic was arrested on November 28, 2012, in Utica, New York, which is located within this district. Dkt. No. 9. As a result, the court also has jurisdiction to hold extradition proceedings in this matter.

2. *Existence of an Applicable Treaty*

■ Section 3184 requires the court to determine whether the treaty under which extradition is requested is in full

---

9. These considerations are not mandated by 18 U.S.C. § 3184, as the government contends. Instead, in the event that a fugitive files a petition for a writ of habeas corpus following certification of extraditability, the court presiding over that petition considers whether the court certifying extradition had the authority and jurisdiction to do so. For the sake of completeness, however, I have included a brief analysis regarding these factors in this decision.

force and effect. Mujagic's extradition is sought principally pursuant to the 1902 Treaty, entered into between the United States and Serbia. Extradition Request at P6. BiH's request for extradition is supported by a declaration of Tom Heinemann, an Assistant Legal–Adviser for the Department of State, attesting that, since the dissolution of the former Yugoslavia, the 1902 Treaty has been applied to BiH as a successor state. Compl. Exh. (Dkt. No. 1–1) at 72. The question of whether a treaty remains valid despite a change in status of one or both of the signatories represents a political question, upon which courts typically "defer to the views of each nation's executive branch." *Hoxha,* 465 F.3d at 562. In this instance, the governments of both the United States and BiH appear to recognize the continuing vitality of the 1902 Treaty, as demonstrated by the contents of the Heinemann declaration, and the fact that the treaty is cited in support of the request of the government of BiH for Mujagic's extradition. Compl. Exh. (Dkt. No. 1–1) at 72; Extradition Request at P6. I therefore find that the 1902 Treaty remains in full force and effect between the United States and BiH, the requesting country. *Extradition of Azra Basic,* 2012 WL 3067466, at *3.

Additionally, although it is not mentioned in BiH's formal request for extradition, according to the complaint filed by the United States, the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT") also calls for Mujagic's extradition. Compl. (Dkt. No. 1) at ¶ 3; Compl. Exh. (Dkt. No. 1–1) at 73. The United States entered into the CAT on November 20, 1994, and BiH became a signatory to it on September 1, 1993. *Id.* The CAT has been executed by over 140 signatory nations, including the United States. *Melaj v. Michael B. Mukasey,* 282

Fed.Appx. 354, 359–60 (6th Cir.2008). That treaty was, at all relevant times, and remains, in full force and effect between United States and the government of BiH. *See Extradition of Azra Basic,* 2012 WL 3067466, at *3 ("[B]oth the United States and BiH are bound by the CAT.").

3. *Whether the Crimes Charged are Covered by the Applicable Treaties*

The court is next called upon to determine whether the crimes with which Mujagic is charged fall within the ambit of the applicable treaties. When making this determination, the court must accord a broad construction to the relevant treaty language. *See Factor v. Laubenheimer,* 290 U.S. 276, 293–94, 54 S.Ct. 191, 78 L.Ed. 315 (1933) ("In choosing between conflicting interpretations of a treaty obligation, a narrow and restricted construction is to be avoided as not consonant with the principles deemed controlling in the interpretation of international agreements."); *see also Skaftouros,* 667 F.3d at 155. A court considering an extradition request should also generally defer to opinions of the Department of State as to the interpretation of potentially applicable treaties. *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng,* 525 U.S. 155, 168, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999) (citing *Sumitomo Shoji Am., Inc. v. Avagliano,* 457 U.S. 176, 184–85, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight.")).

In this instance, Mujagic has been charged with two crimes, both arising under Article 146 of the Criminal Code of the SFRY. First, he is charged with the unlawful killing of an enemy based upon allegations that he shot and killed Baltic after

capturing and disarming him. Second, he is charged with the unlawful wounding of an enemy combatant, which is supported by allegations that he, among other things, shot Cordic's leg, repeatedly kicked the wound, and then forced Cordic to crawl up a hill while Mujagic fired gunshots at him.

### a. *Unlawful Killing of an Enemy*

■ Article I of the 1902 Treaty provides for the extradition of a person charged with any of the crimes specified in Article II. Compl. Exh. (Dkt. No. 1) at 77–78. Article II, in turn, instructs that both murder and attempted murder are extraditable offenses. *Id.* at 78. Therefore, as it relates to BiH's allegation that Mujagic killed Baltic, that crime is extraditable under the 1902 Treaty, and Mujagic does not argue otherwise. *See generally* Mujagic Memo. of Law (Dkt. No. 14).

### b. *Unlawful Wounding of an Enemy*

■ Although the 1902 Treaty does not explicitly govern extradition for the allegations arising from Mujagic's conduct toward Cordic, I find that, when it is considered in conjunction with the CAT, it permits extradition. Article 1 of the CAT provides as follows:

> [T]he term 'torture' means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public offi-

cial or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

Compl. Exh. (Dkt. No. 1–1) at 82. Article 4 of the CAT requires that each state party criminalize torture, attempted torture, and complicity in torture in its domestic criminal laws. *Id.* at 83. In turn, Article 8 of the CAT deems any act prohibited under Article 4 to be an extraditable offense under an extradition treaty existing between any of the state parties. *Id.* at 84; *see also Extradition of Azra Basic*, 2012 WL 3067466, at *3 ("The CAT, by its terms, operates to incorporate torture as an extraditable offense under the [1902] Treaty."). Accordingly, Mujagic is subject to extradition under the 1902 Treaty and CAT if Article 146 of the Criminal Code of the SFRY can be construed to encompass a criminal offense prohibiting torture pursuant to Article 4 of the CAT.[10]

As it relates to the allegations regarding Mujagic's conduct toward Cordic, he is charged with unlawful wounding of the enemy pursuant to Article 146 of the Criminal Code of the SFRY. The relevant statutory language provides as follows:

> (1) Whoever, in violation of the rules of international law during the war or armed conflict, kills or wounds an enemy who has laid down arms or unconditionally surrendered or has no means for the defense, will be punished with a sentence of imprisonment for not less than one year.

Extradition Request at P19, P22. The language of Article 146 does not appear to encompass "torture" as that term is defined in the CAT because nothing in Article 146 gives meaning to the word "wounds." *See generally id.* In addition, neither the United States nor BiH has

---

**10.** I note, parenthetically, that neither the United States nor BiH has provided legal support for its position that Article 146 satisfies the requirements under Article 4.

provided any context in which the court may infer the meaning of "wounds" as it is used in Article 146 of the Criminal Code of SFRY. Nor is there anything in the record to indicate that the SFRY enacted Article 146 in response to its obligations under Article 4 of the CAT. Without any legal or contextual guidance as to how Article 146 of the Criminal Code of SFRY relates to the CAT, if at all, the court compares the specific allegations against Mujagic to the CAT's definition of torture to determine whether he is subject to extradition under that treaty.

After careful consideration, I find that the allegations supporting this charge against Mujagic are sufficient to satisfy the definition of torture under the CAT. It is alleged, among other things, that Mujagic captured Cordic and Baltic, forced Cordic to watch as Baltic was shot to death, threw Cordic to the ground where he was repeatedly kicked, shot Cordic in the leg, kicked the bullet wound after he fell to the ground, and then forced Cordic to crawl up a nearby hill while Mujagic fired gunshots towards him. Extradition Request at 38–47. Certainly, these allegations satisfy the definition of torture in Article 1 of the CAT. *See* Compl. Exh. (Dkt. No. 1–1) at 82 (defining torture as inflicting severe pain or suffering on a person for the purpose of obtaining information where such pain or suffering is inflicted by a person acting in his official capacity). More specifically, it is alleged that Mujagic was acting in his official capacity as a commander of an organized militia at the time of the alleged events. Extradition Request at 38. In addition, Mujagic's alleged conduct towards Cordic was clearly designed to inflict severe physical or mental suffering for the purpose of obtaining the name of Cordic's superior in the BiH army. *See id.* at 39–40 ("[Mujagic] ... asked each of the prisoners to provide the name of their commander. When they replied that they do not know the name of their superior, Mujagic attacked them physically."). As a result, I find that, because the allegations giving rise to the unlawful wounding of the enemy charge amount to an allegation of torture, Mujagic has been charged with an extraditable offense under the CAT.[11] *See generally Extradition of Azra Basic,* 2012 WL 3067466, at *3 (finding that "the extradition mechanics" of the CAT apply where the extraditee was accused of, *inter alia,* torture during war time).

### 4. *Probable Cause*

 The last inquiry for the court under 18 U.S.C. § 3184 is to determine whether there is probable cause to believe that Mujagic committed the crimes for which he stands accused. 18 U.S.C. § 3184; *see Hoxha,* 465 F.3d at 560; *Extradition of Kapoor,* 2012 WL 1318925 at *2. To establish probable cause in an extradition proceeding, "[t]he government is not required to present evidence sufficient to convict." *In re Extradition of Garcia,* 825 F.Supp.2d 810, 828 (S.D.Tex.2011). Instead, the requesting country need only

---

**11.** Moreover, although Article 146 of the Criminal Code of SFRY does not specifically prohibit "torture," as defined in the CAT, there is authority suggesting that state parties to the CAT need not enact criminal offenses that specifically prohibit torture in order to satisfy their obligations under Article 4 of the CAT. *See* Antonio Marchesi, *Implementing the UN Convention Definition of Torture in National Criminal Law (with Reference to the Special Case of Italy),* 6 J. of Int'l Criminal Justice 195, 197–99 (2008) (discussing the reactions of different state parties to the United Nations Committee Against Torture's recommendation that each state party "adopt a distinct, separately defined, offence of torture," and explaining that some state parties, like Poland, Denmark, South Africa, and the United States, do not have a specific criminal provision in their domestic criminal codes prohibiting torture as defined in Article 1 of the CAT).

produce enough evidence "to justify holding the extraditee to answer the charges pending against him[.]" *Extradition of Kapoor,* 2012 WL 1318925, at *4; *Sandhu v. Burke,* No. 97–CV–4608, 2000 WL 191707, at *5 (S.D.N.Y. Feb. 10, 2000). Probable cause is established where the evidence presented "would support a reasonable belief that [the extraditee] was guilty of the crime charged[.]" *Ahmad v. Wigen,* 910 F.2d 1063, 1066 (2d Cir.1990) (citing *Fernandez v. Phillips,* 268 U.S. 311, 312, 45 S.Ct. 541, 69 L.Ed. 970 (1925)); *Sandhu,* 2000 WL 191707, at *5; *see also Hoxha,* 465 F.3d at 561 ("The probable cause standard applicable to an extradition hearing is the same as the standard used in federal preliminary hearings.").

■ In this instance, the extensive materials submitted by BiH to support the request for extradition convincingly establish the existence of probable cause to believe that Mujagic committed the crimes alleged. The charges filed against Mujagic in BiH were supported by witness accounts of those present on the day in question, including Cordic, the allegedly tortured BiH army militant, as well as others who were subordinate to Mujagic in the APZB army. Extradition Request at P39–47. After reviewing the relevant materials, the Cantonal Court in Bihac found there was sufficient evidence to charge Mujagic with the unlawful killing and wounding of the enemy. *Id.* at P32–33. Among this evidence are the medical records from the provisionary clinic of APZB, where Cordic was first treated following the incident, which confirm that he suffered wounds in the leg and back. *Id.* at P15. Although the autopsy of Baltic's body, following exhumation in 2001, was inconclusive in determining whether he suffered entrance wounds in the area of the abdomen and internal vital organs, holes in Baltic's clothing were consistent with the theory that he was shot in the upper portion of his body. *Id.* at P16.

In addition, ICE Special Agent Hack conducted an independent investigation into the case beginning in March 2008. Extradition Request at P23. Special Agent Hack surveyed the case files, documents, and other material evidence collected by BiH officials during their investigation. *Id.* Special Agent Hack also interviewed six members of Mujagic's APZB squad who were subordinate to him on the date of the alleged incidents. *Id.* at 25. Five of those persons accurately identified Mujagic in a photo array during Special Agent Hack's investigation. *Id.* All six confirmed the events alleged by BiH officials. *Id.* The agent also reviewed medical records associated with Cordic's hospitalization following the incident, as well as the results of an autopsy conducted after the body of Baltic was exhumed. *Id.*

Based on the foregoing, I find the existence of sufficient, competent evidence to satisfy the probable cause requirement of 18 U.S.C. § 3184 and justify holding Mujagic for trial in BiH.

### D. *Remaining Issues*

Although I have concluded that section 3184's requirements have been met, there are four additional issues, one raised by the court *sua sponte,* and the other three by Mujagic, that must be addressed before a certificate of extradition may be issued.

#### 1. *Warrant Requirement*

Article III of the 1902 Treaty requires that, when a country seeks extradition of a fugitive charged with a crime, it must produce "a duly authenticated copy of the warrant of arrest in the country where the crime has been committed[.]" Compl. Exh. (Dkt. No. 1–1) at 79.

In this case, the materials before the court at the time of Mujagic's extradition

hearing did not contain a document specifically denominated as a warrant for his arrest. *See generally* Extradition Request. Since the date of the hearing, however, the United States government has argued that the combination of certain documents included in the extradition request constitute the equivalent of an arrest warrant sufficient to satisfy Article III of the 1902 Treaty. Dkt. No. 23. Specifically, the government argues that the order from the Cantonal Court in Bihac authorizing the issuance of an international warrant for Mujagic's arrest, Extradition Request at P27–28, and that court's decision, dated January 22, 2008 (the "January order"), authorizing Mujagic's detention, *id.* at P35–37, are sufficient to satisfy the 1902 Treaty's warrant requirement. Dkt. No. 23 at 1–2. Mujagic does not respond to these particular arguments, but instead argues that the January order only authorized his detention for a period of one month following arrest, a period of time that has now expired. Dkt. No. 26 at 2.

■ The Second Circuit has made clear that " 'a valid arrest warrant' [in the context of an extradition proceeding] is one that is 'duly authenticated' as required by [section] 3190 and the applicable treaty, and sufficient to show that the fugitive is *currently charged* with an offense recognized by the treaty." *Skaftouros*, 667 F.3d at 160 (emphasis in original). Here, both the January order and the Cantonal Court's order authorizing the issuance of an international arrest warrant satisfy the Second Circuit's requirements. Both documents are duly authenticated, and both sufficiently demonstrate that Mujagic was, at the time of the issuance of the orders, charged with the crimes of unlawful killing and wounding of the enemy. Extradition Request at P27–28, P35–37.' Nonetheless, the United States government has offered, on behalf of BiH, an INTERPOL diffusion notice, which, it contends, constitutes the international arrest warrant authorized by the Cantonal Court.[12] Dkt. No. 23–1. The combination of all of these properly authenticated documents provides the court with sufficient assurance that Article III of 1902 Treaty has been satisfied.[13] *See Grin*

---

12. Although the warrant has not been authenticated by BiH authorities, it is certified as authentic by Mark A. Sheley, a representative of the United States Department of Justice—United States Marshal Service, on detail with INTERPOL Washington, E.S. National Census Bureau, and therefore is accepted by the court as properly certified. Dkt. No. 23–1.

13. In any event, even if the court was to find that the warrant requirement of the 1902 Treaty had not been satisfied, it appears that 18 U.S.C. § 3184 governs the requirements for extradition, and trumps the warrant requirement found in the applicable extradition treaty. In *Grin v. Shine*, 187 U.S. 181, 23 S.Ct. 98, 47 L.Ed. 130 (1902), the Supreme Court opined that,

> [w]hile the treaty contemplates the production of a copy of a warrant of arrest or other equivalent document, ... it is within the power of Congress to dispense with this requirement, and we think it has done so by [the relevant extradition statute in force at

the time] ... But notwithstanding such treaty, Congress has a perfect right to provide for the extradition of criminals in its own way, with or without a treaty to that effect, and to declare that foreign criminals shall be surrendered upon such proofs of criminality as it may judge sufficient.... Th[e warrant requirement] is one of the requirements of the treaty which Congress has intentionally waived.

*Grin*, 187 U.S. at 191–92, 23 S.Ct. 98. Similarly, in 1913, the Supreme Court held that one of the requirements found in an extradition treaty between the United States and Italy was unenforceable because it was not found in the extradition statute. *See Charlton v. Kelly*, 229 U.S. 447, 463–64, 33 S.Ct. 945, 57 L.Ed. 1274 (1913) ("Had there been no law of Congress upon the subject, the ... committing magistrate could have proceeded only according to the treaty, for that would have been the only law of the land applicable to the case and the only source of his authori-

*v. Shine*, 187 U.S. 181, 190, 23 S.Ct. 98, 47 L.Ed. 130 (1902) (holding that "the production of an equivalent document" that "is evidently designed to secure the apprehension of the accused, and his production before an examining magistrate" is "sufficient compliance with the [applicable] treaty['s warrant requirement]").

In a related argument, Mujagic contends that the January order does not authorize his detention for any longer than one month after seizure by United States authorities, a period that has now expired. This argument is unpersuasive. In a properly authenticated letter, a Bihac prosecutor has informed the court that the January order's language regarding the holding period was intended to authorize Mujagic's detention for not longer than one month beginning on the date he is brought before the Cantonal Court in Bihac. Dkt. No. 25–1 at 2. Because I find this interpretation to be reasonable under the circumstances, I have credited this explanation and rejected Mujagic's argument.

### 2. *Statute of Limitations*

Mujagic argues that he cannot be extradited under the 1902 Treaty because his prosecution for the offenses charged would be time-barred under the laws of this country. Mujagic's Memo. of Law (Dkt. No. 14) at 11–15.

 Article VII of the 1902 Treaty provides as follows:

> Extradition shall not be granted, in pursuance of the provisions of this Treaty, if

legal proceedings of the enforcement of the penalty for the act committed by the person claimed has become barred by the statute of limitation, according to the laws of the country to which requisition is addressed.

Compl. Exh. (Dkt. No. 1–1) at 80. Under this provision, the court must determine whether prosecution of Mujagic for the offenses charged would be precluded as untimely under the laws of the United States, as the country to which the request for extradition is directed. *Extradition of Azra Basic*, 2012 WL 3067466, at *14; *Extradition of Handanovic*, 829 F.Supp.2d at 991. To determine which domestic statute of limitations applies, the court must look to the United States criminal provisions most analogous to the two offenses charged, and apply the statutes of limitations pertaining to those crimes. *Extradition of Handanovic*, 829 F.Supp.2d at 991 (citing *Sainez v. Venables*, 588 F.3d 713, 716 (9th Cir.2009)); *Extradition of Azra Basic*, 2012 WL 3067466, at *14.

### a. *Unlawful Killing of an Enemy*

The government argues that the crime charged as a result of Mujagic's alleged killing of Baltic is most closely analogous to first degree murder in violation of 18 U.S.C. § 1111(a).[14] Government's Reply Memo. of Law (Dkt. No. 16) at 11–17. First degree murder is not subject to a period of limitations. 18 U.S.C. § 3281. In opposition, Mujagic argues that, because the crime with which he is charged in BiH contains no intent element, and, in

---

ty.") Accordingly, in this case, even if BiH had not presented the court with the INTERPOL warrant or the equivalent of a warrant for arrest, as required under Article III of the 1902 Treaty, that defect would not necessarily be fatal to its extradition request.

**14.** That section provides, in relevant part, as follows:

> Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; ... or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree. 18 U.S.C. § 1111(a).

any event, the allegations giving rise to the unlawful killing charge do not meet the *mens rea* requirements of section 1111(a), the offense charged is more akin to second degree murder or manslaughter, either of which is subject to a five year statute of limitations, pursuant to 18 U.S.C. § 3282. Mujagic's Memo. of Law (Dkt. No. 14) at 11–15.

The fact that the criminal charge with which Mujagic has been charged for the alleged killing of Baltic does not contain an intent element is not dispositive; in extradition proceedings, courts focus on the nature of the alleged conduct when determining the most analogous federal provision. *See Clarey v. Gregg*, 138 F.3d 764, 766–67 (9th Cir.1998) ("The object of Article 7 of the Treaty is to preclude extradition of a person whose prosecution in the United States would offend our national statute of limitations if he had committed his criminal conduct here."); *Extradition of Azra Basic*, 2011 WL 5326140, at *6 (E.D.Ky. Nov. 4, 2011) (analyzing the 1902 Treaty's limitations provision by inquiring into the "underlying [criminal] behavior").

■■■ In this case, the court has little difficulty concluding that the most analogous criminal provision under United States law to the unlawful killing charge is first degree murder, in violation of 18 U.S.C. § 1111(a). The facts alleged in the extradition request, which have previously been recounted in detail, reflect that, after repeatedly beating Baltic, who was a cap-

tured, unarmed enemy combatant, Mujagic summarily executed him by firing his 7.62 caliber assault rifle into his chest while he stood three meters away. Extradition Request at P29–30. These allegations are certainly sufficient to satisfy the "malice aforethought" *mens rea* requirements of first degree murder. 18 U.S.C. § 1111(a); *see also Extradition of Azra Basic*, 2011 WL 5326140, at *6 (finding that allegations that the fugitive intentionally beat the victim "to the point of unconsciousness" and then slit the victim's throat with a knife were sufficient to give rise to first degree murder under United States law).

b. *Unlawful Wounding of an Enemy*

At oral argument, Mujagic argued that the crime of unlawful wounding of the enemy is most closely analogous to 18 U.S.C. § 2441(d)(1)(F),[15] Dkt. No. 24 at 39–40, which carries a five-year statute of limitations, pursuant to 18 U.S.C. § 3282. Mujagic contends that, because the relevant charges were not filed against him in BiH until April 19, 2001, six years after the alleged unlawful conduct against Cordic, the statute of limitations has expired on this charge. Mujagic's Memo. of Law (Dkt. No. 14) at 10–11; Dkt. No. 24 at 39–40. In response, the government asserts that the most analogous domestic law is 18 U.S.C. § 2340A, which is the statute prohibiting torture outside the United States.[16] Dkt. No. 16 at 18. Prosecution under that criminal provision, in turn, is subject to an eight-year statute of limita-

---

**15.** That provision proves as follows:
> (F) Intentionally causing serious bodily injury.—The act of a person who intentionally causes, or conspires or attempts to cause, serious bodily injury to one or more persons, including lawful combatants, in violation of the law of war.

18 U.S.C. § 2241(d)(1)(F).

**16.** In relevant part, that provision provides as follows:

(a) Offense.—Whoever outside the United States commits or attempts to commit torture shall be fined under this title or imprisoned not more than 20 years, or both, and if death results to any person from conduct prohibited by this subsection, shall be punished by death or imprisoned for any term of years or for life. 18 U.S.C. § 2340A(a).

tions pursuant to 18 U.S.C. §§ 3286(a), 2332(g)(5)B).[17] The term "torture" is defined by statute as "an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control[.]" 18 U.S.C. § 2340(1).

 I have no difficulty concluding that Mujagic's alleged conduct toward Cordic meets the definition of torture, and therefore would implicate section 2340A. The allegations set forth in the extradition request indicate that Cordic was in Mujagic's physical control, which is demonstrated by the allegation that Mujagic and his fellow APZB soldiers captured and disarmed Cordic, Baltic, and the third unidentified BiH soldier. Extradition Request at P8. In addition, Mujagic was acting under color of law when he allegedly tortured Cordic because he was the commander of the platoon of an established insurgent army that defended the northwestern region of BiH.[18] *Id.* Based upon this finding, I conclude that the BiH prosecution is not barred by the statute of limitations, even assuming that the prosecution began on April 19, 2001, the date on which the Cantonal Court found "reasonable doubt," rather than on May 11, 1996, the date on which the Bihac criminal police filed criminal charges with the prosecutor, inasmuch as April 19, 2001, is within the eight-year period of limitations governing section 2340A.

### 3. Political Crimes Exception

The 1902 Treaty provides an exception to extradition where the fugitive is sought for prosecution of a political offense. Specifically, Article VI of the 1902 Treaty provides, in pertinent part, as follows:

> A fugitive criminal shall not be surrendered if the offense in respect of which his surrender is demanded be a political character, or if he provides that the requisition for his surrender has, in fact, been made with a view to try or punish him for an offense of a political character.

Compl. Exh. (Dkt. No. 1–1) at 79–80. Mujagic argues that, because his alleged offenses fall within this political offense exception, he is not subject to extradition under the 1902 Treaty. Mujagic's Memo. of Law (Dkt. No. 14) at 5–9. In response,

---

**17.** That provision provides, in pertinent part, that,

> [n]otwithstanding sections 3282 [providing for a five-year general statute of limitation], no person shall be prosecuted, tried, or punished for any noncapital offense involving any provision listed in [18 U.S.C. § ]2332b(g)(5)(B) ... unless the indictment is found or the information is instituted within eight years after the offense was committed.

18 U.S.C. § 3286(a). Section 2332(g)(5)(B) includes offenses in violation of section 2340A. 18 U.S.C. § 2332b(g)(5)(B); *see also* James P. Terry, *Torture and the Interrogation of Detainees*, 32 Campbell L.Rev. 595, 611 n. 109 (2010).

**18.** Neither BiH, the United States, nor Mujagic have provided the court with any guidance as to how "color of law" is defined or used in the context of section 2340A. In the context of 42 U.S.C. § 1983, however, the Second Circuit has defined the phrase "color of law" to mean "under pretense of law," and has said that "acts of officers in the ambit of their personal pursuits are plainly excluded." *Pitchell v. Callan*, 13 F.3d 545, 547–48 (2d Cir. 1994) (internal quotation marks omitted) (citing *Screws v. United States*, 325 U.S. 91, 111, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945)). Using this definition, it is clear that Mujagic acted in his official capacity as an APZB platoon commander (and not acting "in the ambit of [his] personal pursuit") when he allegedly captured, disarmed, and interrogated Cordic and the other BiH soldiers, and then beat, shot, and/or killed them with the assistance of other APZB combatants.

the United States government contends that Mujagic cannot meet the requirements of this narrow exception. Government's Reply Memo. of Law (Dkt. No. 16) at 2–11.

Courts have recognized two types of political offenses: pure or directly political, and relative or incidentally political. *Ahmad v. Wigen*, 726 F.Supp. 389, 401 (S.D.N.Y.1989), *aff'd* 910 F.2d 1063 (2d Cir.1990). Pure political offenses are typically "directed against the state and involves none of the elements of ordinary crime." *Ahmad*, 726 F.Supp. at 401. This type of political offense often includes treason, sedition, and espionage. *Id.* (*citing Eain v. Wilkes*, 641 F.2d 504, 512 (7th Cir.1981)). A relative political offense is one that involves "an otherwise common crime committed as a political act or for political motives or in a political context." *Id.* (*citing Eain*, 641 F.2d at 512). Here, Mujagic urges that his conduct falls within the relative political offense exception. Mujagic's Memo. of Law (Dkt. No. 14) at 6.

To qualify for the relative political offense exception, a fugitive must show that his conduct was "incidental to and formed a part of a political disturbance." *Ahmad*, 726 F.Supp. at 401; *see also Sindona v. Grant*, 619 F.2d 167, 173 (2d Cir. 1980) ("American courts have uniformly construed 'political offense' to mean those that are incidental to severe political disturbances such as war, revolution and rebellion."). Specifically, a fugitive must prove, by a preponderance of evidence, that "1) there was a violent political disturbance of such a degree as to constitute in effect a state of civil war; 2) the acts charged were incident to the disturbance; and 3) the acts did not violate the Law of Armed Conflict."[19] *Ahmad*, 726 F.Supp. at 408.

### a. Existence of Violent Political Disturbance

Because neither the United States nor BiH dispute that there was a political disturbance in BiH at the time of Mujagic's alleged offenses, the first element of the

---

19. Mujagic argues that the court need not consider whether his alleged conduct violated international law. Mujagic's Memo. of Law (Dkt. No. 14) at 6–8. In support of this argument, he relies primarily on a Ninth Circuit decision denying extradition of a militant charged with murder. *Quinn v. Robinson*, 783 F.2d 776 (9th Cir.1986). In *Quinn*, the Ninth Circuit stated that "it is not our place to impose our notions of civilized strife on people who are seeking to over throw the regimes in control of their countries in contexts and circumstances that we have not experienced," and adding that the "tactics that are used in such internal political struggles are simply irrelevant to the question whether the political offense is acceptable." *Quinn*, 783 F.2d at 804–05. *Quinn*, however, has been roundly criticized by other courts. *See, e.g., Ordinola v. Hackman*, 478 F.3d 588, 602–04 (4th Cir.2007). Indeed, during the recent extradition hearing, Mujagic's counsel conceded as much, agreeing that *Quinn* had

been "almost universally rejected" in other circuits. Dkt. No. 24 at 48. At least one court in this circuit has expressly rejected *Quinn*, reaffirming that "the appropriate standard by which to define the political offense exception is the 'Law of Armed Conflict.'" *Ahmad*, 726 F.Supp. at 405. Additionally, another district court in this circuit has found that

> no act [should] be regarded as political where the nature of the act is such as to be violative of international law, and inconsistent with international standards of civilized conduct. Surely an act which would be properly punishable even in the context of a declared war or in the heat of open military conflict cannot and should not receive recognition under the political exception to the Treaty.

*In re Doherty*, 599 F.Supp. 270, 274 (S.D.N.Y. 1984). As a result, I have considered the third prong of the relevant test as enunciated in *Ahmad*.

incidence test is satisfied. Government's Reply Memo. of Law (Dkt. No. 16) at 6–7.

#### b. Whether the Acts Charged Were Incidental to the Disturbance

To satisfy the second element, Mujagic must prove that his actions were incidental to or in furtherance of the uprising in BiH by demonstrating a nexus between the allegations giving rise to the criminal charges and a political uprising. *Ordinola v. Hackman,* 478 F.3d 588, 599 (4th Cir. 2007); *see also Eain,* 641 F.2d at 520–21 ("The [political offense] exception does not make a random bombing intended to result in the cold-blooded murder of civilians incidental to a purpose of toppling a government, absent a direct link between the perpetrator, a political organization's political goals, and the specific act."). When examining this prong of the governing test, courts have considered "the character of the foray, the mode of attack, the persons killed or captured, and the kind of property taken or destroyed[.]" *Ornelas v. Ruiz,* 161 U.S. 502, 511–12, 16 S.Ct. 689, 40 L.Ed. 787 (1896).

In this case, the allegations giving rise to the unlawful killing and wounding of the enemy criminal charges against Mujagic are sufficient to demonstrate the necessary nexus between the political disturbance and Mujagic's specific conduct toward Baltic and Cordic. BiH's extradition request alleges that Baltic and Cordic were members of the BiH army, which was engaged in action against Mujagic's military force, the APZB army, on the date giving rise to Mujagic's criminal charges. Extradition Request at P8. The extradition request further alleges that the BiH army was involved in a battle with the APZB army in the area of Kumarice, located east of Velika Kladusa. *Id.* When some of the BiH soldiers attempted to escape the battle into a nearby forest, APZB forces, including Mujagic, captured and disarmed three BiH soldiers, including Baltic and Cordic. *Id.* Upon capturing Baltic and Cordic, it is alleged that Mujagic interrogated, tortured, and/or killed them for the identity of their superior in the BiH army. *Id.* at P9. All of these allegations are sufficient to demonstrate a link between the political uprising in BiH during the relevant time period and the allegations of Mujagic's conduct that give rise to his criminal charges.

#### c. The Laws of Armed Conflict

Having established the first two elements of the political offense exception, Mujagic's ability to avail himself it under the 1902 Treaty turns on his ability to establish that his actions did not violate international laws of armed conflict. *Ahmad,* 726 F.Supp. at 408.

▮ The government has identified ample authority to support the conclusion that Mujagic's alleged actions toward Baltic and Cordic violated international laws of armed conflict, including the Hague Convention IV Respecting the Laws and Customs of War on Land of October 18, 1907 (the "Hague Convention"), the Geneva Convention Relative to the Treatment of Prisoners of War of August 12, 1949 (the "Geneva Convention"), and the CAT. The United States and BiH are state parties to each of these treaties. Dkt. No. 24 at 17.

Article 23 of the Hague Convention prohibits the killing or wounding of "an enemy who, having laid down his arms, or having no longer means of defense, has surrendered at discretion." Hague Convention (IV) Respecting the Laws and Customs of War on Land, Oct. 18, 1907, art. 23, 1910 WL 19348, at *3. Article 3 of the Geneva Convention prohibits "violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture" of prisoners, and applies specifically to

"members of armed forces who have laid down their arms and those placed *hors de combat* by sickness, wounds, detention or any other cause." Geneva Convention (III) Relative to the Treatment of Prisoners of War, Aug. 12 1949, art. 3, 1956 WL 3365. Finally, Article 2 the CAT states that "[n]o exceptional circumstances whatsoever, whether a state of war or threat of war, internal political in stability [sic] or any other public emergency, may be invoked as a justification of torture." UN General Assembly, Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, art. 2(2), 23 ILM 1027, 1028 (1984).

Of course, the allegations that Mujagic killed Baltic would violate Article 23 of the Hague Convention and Article 3 of the Geneva Convention. In addition, as was discussed above, the allegations regarding Mujagic's conduct toward Cordic are sufficient to constitute an allegation of torture under the definition of Article 1 of the CAT and 18 U.S.C. § 2340A. For this reason, Mujagic's alleged torture of Cordic would violate Article 23 of the Hague Convention, Article 3 of the Geneva Convention, and Article 2 of the CAT.

While most cases addressing this issue have dealt with conduct directed toward innocent civilians,[20] when considered together, they support the conclusion that Mujagic's alleged killing and torture of Baltic and Cordic, who were unarmed prisoners of war, violated the international laws of armed conflict. *See Extradition of Handanovic,* 829 F.Supp.2d at 997–98 (holding that the fugitive was extraditable for the murder of prisoners of war); *Extradition of Artukovic,* 628 F.Supp. 1370, 1376 (C.D.Calif.1986), *overruled on other grounds by Lopez–Smith v. Hood,* 121 F.3d 1322 (9th Cir.1997) (holding that the fugitive's conduct did not fall under the political exception where the offense was "impermissible vengeance upon disarmed enemy soldiers"); *see also* Bradley Larschan, *Extradition, The Political Offense Exception and Terrorism: An Overview of the Three Principal Theories of Law,* 4 B.U. Int'l L.J. 231, 279 (1989) ("[K]illing of prisoners of war, hostages and civilians ... has no connection whatever with the successful prosecution of an armed struggle; indeed, such methods are universally rejected by states."). Accordingly, because the allegations contained in BiH's extradition request are sufficient to allege that Mujagic's conduct toward Baltic and Cordic violated international law, his extradition is not precluded by the political offense exception of the 1902 Treaty.

### 4. Anticipated Mistreatment as a Basis to Oppose Extradition

In his opposition to the request for a certificate of extraditability, Mujagic raises the specter of mistreatment, or even torture, at the hands of BiH officials, should he be extradited. Mujagic's Memo. of Law (Dkt. No. 14) at 16–19. He bases that assertion on various governmental reports from both here and abroad concerning human rights conditions in BiH, as well as the fact that Cordic, the surviving victim of the events giving rise to this case, is now, in essence, a police officer in BiH. *Id.*

When analyzing requests for extradition under section 3184, a court must follow the "rule of non-inquiry"—a firmly established principle that precludes courts from examining the procedures or treat-

---

**20.** *See, e.g., Ahmad,* 726 F.Supp. at 389 (holding that the fugitives' alleged bombing of a civilian bus violated the laws of armed conflict); *In re Extradition of Marzook,* 924 F.Supp. 565, 577–78 (S.D.N.Y.1996) (holding that attacks targeted at civilians do not fall within the political offense exception).

ment awaiting the surrendered fugitive in the requested jurisdiction—and requires that it defer to the executive branch on such matters.[21] *Hoxha,* 465 F.3d at 563; *Kin–Hong,* 110 F.3d at 110–11; *Sandhu,* 2000 WL 191707, at *7. As the Second Circuit has noted, "It is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds." *Ahmad,* 910 F.2d at 1067. As a result, Mujagic's concerns related to his treatment upon return to BiH are more properly considered by the Secretary of State in determining extraditability.

## IV. *SUMMARY, ORDER AND CERTIFICATION*

The court has carefully reviewed the materials submitted by the United States in support of BiH's request for the extradition of Sulejman Mujagic, and concludes that the requirements of 18 U.S.C. § 3184 have been satisfied, and that he has offered no lawful grounds to deny BiH's request for a certificate of extraditability. Accordingly, it is hereby respectfully,

CERTIFIED to the Department of State that the evidence presented to the court in this matter is sufficient to sustain the charges against Sulejman Mujagic, as reflected in the complaint in this matter, alleging the murder of Ekrem Baltic and the torture of Nisvet Cordic, under the provisions of the Treaty Between the United States and Servia for the Mutual Extradition of Fugitives from Justice, signed on October 25, 1901, and entered into force on June 12, 1902, and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, entered into force on November 20, 1994, for the United States, and on September 1, 1993, for BiH, based upon the court rec-

ord, which contains properly authenticated documents in support of the request for extradition, and which record is hereby certified to the Secretary of State; and it is further hereby

ORDERED that Mujagic shall be committed to a proper detention facility designated by the United States Marshal, where he shall remain until his surrender to the proper authorities of BiH, in accordance with the applicable laws; and it is hereby further

ORDERED that Mujagic's proffer of Exhibits A and B at the extradition hearing on February 6, 2013, is *DENIED,* based upon a lack of foundation and proper authentication.

21. "The non-inquiry principle serves interests of international comity by relegating to political actors the sensitive foreign policy judg-ments that are often involved in the question of whether to refuse an extradition request." *Hoxha,* 465 F.3d at 563.